David E. Bower, Esq. (State Bar No. 119546)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, California 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-Mail: dbower@faruqilaw.com

Michael J. Hynes, Esq.
Ligaya Hernández, Esq.
**FARUQI & FARUQI, LLP**
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone:  (215) 277-5770
Facsimile:   (215) 277-5771
E-Mail: mhynes@faruqilaw.com
E-Mail: lhernandez@faruqilaw.com

Beth A. Keller, Esq.
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone:  (212) 983-9330
Facsimile:   (212) 983-9331
E-Mail: bkeller@faruqilaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER KIENZLE, Derivatively on Behalf of Nominal Defendant MAXWELL TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> DAVID J. SCHRAMM, ROBERT L. GUYETT, MARK S. ROSSI, YON YOON JORDEN, ROGER L. HOWSMON, KEVIN S. ROYAL, VAN M. ANDREWS, and GEORGE KREIGLER III, <br><br> Defendants, <br><br> -and- <br><br> MAXWELL TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Case No. **'13 CV 0966 L    WVG** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Walter Kienzle ("Plaintiff"), by his undersigned attorneys, submits this Verified Shareholder Derivative Complaint in the name and on behalf of nominal defendant Maxwell Technologies, Inc. ("Maxwell" or "the Company") against certain officers and members of the Board of Directors of Maxwell (the "Board") named herein (collectively the "Individual Defendants").   Plaintiff bases his allegations against the Individual Defendants upon personal knowledge as to his own acts and on information and belief as to all other allegations, based on due investigation by counsel, including: (a) review and analysis of public filings made by Maxwell and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Individual Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Maxwell's websites concerning the Company's public statements; and (d) review of other publicly available information concerning Maxwell and other persons.

## **SUMMARY OF THE ACTION**

1.    This is a shareholder derivative action brought on behalf of nominal defendant Maxwell against the Individual Defendants alleging that these officers and directors breached their duties to the Company from April 28, 2011 to the present (the "Relevant Period") by causing or allowing the Company to issue false and misleading statements, which has caused substantial monetary losses to Maxwell in addition to substantial damages to its reputation and goodwill.   On behalf of Maxwell, this action seeks monetary damages, corporate governance reforms, accounting reforms, and removal of the infringing officers and directors to remedy the Individual Defendants' breaches of their fiduciary duties to the Company.

2.    Maxwell is a company that develops, manufactures, and markets energy storage, power delivery, and microelectronic products worldwide.

3.     During the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements about the Company's financial condition, operations, management, and internal controls.  In particular the Individual Defendants failed to disclose that the Company had overstated its revenues and earnings in 2011 and 2012 in violation of United States' Generally Accepted Accounting Principles ("GAAP"), had prematurely recognized revenues, and lacked sufficient internal accounting controls causing a 62% drop in the stock price following the disclosure of the corrected accounting numbers.

4.     The Individual Defendants knew that Maxwell's stock was artificially inflated and neglected to inform shareholders of the truth, in violation of their fiduciary duties.

5.     Furthermore, the Individual Defendants' issuance of these materially false and misleading statements and violations of GAAP have subjected Maxwell to a complaint for violation of the federal securities laws, currently pending in this Court, and captioned *Foster v. Maxwell Tech., Inc., et al*, 3:13-CV-00580-H-RBB (S.D. Cal., filed Mar. 13, 2013) (hereinafter the "Securities Class Action").  In defending the Securities Class Action, Maxwell has incurred investigative and litigation costs, and is faced with substantial potential liability for violations of securities laws, and the costs of defending the suit.

6.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Maxwell has sustained damages, including, but not limited to, the costs and expenses incurred as a result of its internal investigations conducted by the Audit Committee and the Board of Directors with the assistance of outside forensic accountants, the ongoing expenses of the securities litigation stemming from this matter, the expense of implementing controls to remedy this situation, the payment of additional incentive based compensation for the Individual  Defendants based on the inflated financial figures reported as a result of the inadequate internal controls, and a

reduction in market capitalization.  Furthermore, Maxwell continues to be injured by the Individual Defendants' breaches of fiduciary duties through damage to the Company's reputation and goodwill.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00.

8.     This Court has personal jurisdiction over each of the defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under the traditional notions of fair play and substantial justice.

9.     Venue is proper in this District pursuant to 28 U.S.C § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

### Plaintiff

10.     Plaintiff Walter Kienzle is presently a shareholder of Maxwell and has been a shareholder at all times necessary to the claims asserted herein.  Plaintiff is a citizen of the State of Illinois.

**Nominal Defendant**

11. Nominal Defendant Maxwell Technologies, Inc. is a Delaware corporation, maintaining its principal executive offices at 5271 Viewridge Court, Suite 100, San Diego, California 92123. According to its public filings, Maxwell provides energy related technological products primarily in the United States.

**Individual Defendants**

12. Defendant David J. Schramm ("Schramm") is and was at all relevant times Maxwell's President and Chief Executive Officer ("CEO"). He is also a director of Maxwell and has been since July 2007. During the Relevant Period, Schramm participated in the wrongful conduct and issuance of improper statements, including the preparation of improper press releases and improper SEC filings and approval of other statements made to the press, security analysts, and Maxwell shareholders. Defendant Schramm is a citizen of the State of California.

13. Defendant Robert L. Guyett ("Guyett") has served as a director since January 2000. Guyett was Chairman of the Board from May 2010 to May 2011, and previously from May 2003 to May 2007. Guyett is and was at all relevant times the Chairman of the Audit Committee. He is and was at all relevant times also a member of the Compensation and Governance & Nominating Committees. Guyett is a Certified Public Accountant ("CPA"). Given his licensing as a CPA and positions as a director and as Chairman of the Audit Committee, he had ample opportunity to prevent the false and misleading statements as well as to rectify the insufficient internal controls over financial reporting that pervaded Maxwell. Defendant Guyett is a citizen of the State of New York.

14. Defendant Mark S. Rossi ("Rossi") has served as Chairman of the Board of Directors since May 2011. Rossi is and was at all relevant times the Chairman of the Compensation Committee. He is and was at all relevant times also a member of

the Audit and Governance & Nominating Committees.  Rossi has been a director of Maxwell since 1997.  Defendant Rossi is a citizen of the State of New York.

15.   Defendant Yon Yoon Jorden ("Jorden") is a director of Maxwell and has been since 2008.  Jorden has been Chairman of the Governance & Nominating Committee since 2010.  She is also a member of the Audit Committee and has been since 2008.  Prior to joining the Maxwell Board, Jorden served as the CFO, Senior Vice President, and Principal Accounting Officer of Caremark PCS from May 2002 to 2004.  Throughout her 25 year career she has served in financial management positions of increasing responsibility, ranging from Internal Audit Director to Executive Vice President and CFO for publicly traded companies, including Western Digital Corporation, Aera Energy LLC, AdvancePCS, and Blue Cross and Blue Shield of California.  Jorden was recruited for the Maxwell Board and Audit Committee based on her accounting and financial management experience.  Given her vast experience and positions on the Board and Audit Committee, she had ample opportunity to prevent the false and misleading statements as well as to rectify the insufficient internal controls over financial reporting that pervaded Maxwell. Defendant Jorden is a citizen of the State of Texas.

16.   Defendant Roger L. Howsmon ("Howsmon") is a director and a member of the Compensation Committee.  He has been a director of Maxwell since 2008. Defendant Howsmon is a citizen of the State of California.

17.   Defendant Kevin S. Royal ("Royal") is and was at all relevant times Maxwell's Chief Financial Officer ("CFO"), Senior Vice President, Treasurer, and Secretary.  He has served in those positions since 2009.  During the Relevant Period, Royal participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Maxwell shareholders.   Defendant Royal is a citizen of the State of California.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    6

18.     Defendant Van M. Andrews ("Andrews") served as Senior Vice President, Sales and Marketing throughout the Relevant Period until March 1, 2013, when he resigned as a direct result of the ongoing investigations into false and misleading statements made by the Individual Defendants being carried out by Maxwell's Audit Committee and Board of Directors.  Defendant Andrews is a citizen of the State of California.

19.     Defendant George Kreigler III ("Kreigler") served as Maxwell's Chief Operating Officer from August 2009 to April 2012.  Defendant Kreigler is a citizen of the State of Colorado.

20.     The defendants referenced above in ¶¶ 12-19 above are collectively referred to herein as the "Individual Defendants."  The defendants referenced in ¶¶ 12-16 above are collectively referred to herein as the "Director Defendants."  The defendants referenced in ¶¶ 12, and 17-19 above are collectively referred to herein as the "Officer Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

21.     The Individual Defendants have stringent fiduciary obligations to Maxwell and its shareholders.

22.     By reason of their positions as officers, directors and/or fiduciaries of Maxwell and because of their ability to control the business and corporate affairs of Maxwell, the Individual Defendants owe Maxwell and its shareholders fiduciary obligations of trust, loyalty, good faith, due care, disclosure, candor, and oversight, and are required to use their utmost ability to control and manage Maxwell in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Maxwell and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

23.     Each director and officer of the Company owes to Maxwell and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's true forecasts and business prospects.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Maxwell, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Maxwell, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, market demands for products, and improper representations of Maxwell.

25.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Maxwell, and was at all times acting within the course and scope of such agency.

26.     To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its

business, to avoid wasting the Company's assets, and to maximize the Company's value;

(c)     remain informed as to how Maxwell conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(d)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations;

(e)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(f)     ensure that the Company's revenue projections were based on appropriate support and documentation, and were routinely checked for accuracy;

(g)     ensure that there were sufficient checks and balances in Maxwell's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue or asset values; and

(h)     ensure that no inaccurate financial information about Maxwell was released to the public that would tend to artificially inflate Maxwell's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

27.     Moreover, Maxwell maintains a Code of Business Conduct and Ethics (hereafter the "Code"), which applies to Maxwell's "directors, officers, employees, and agents, whether they work for Maxwell on a full-time, part-time, consultative, or

temporary basis."   The purpose of the Code is to "[describe] the core values and beliefs of Maxwell and [provide] the foundation for all business conduct.   Our guidelines for conducting Maxwell business are consistent with the highest standards of business ethics."   The Code states in relevant part:

> It is essential that each employee views these standards not as a burden but as a core part of Maxwell's values and understands that violations of these standards will not be tolerated. All Maxwell employees have a duty to report any known or suspected violation of this Code, including any violation of laws, rules, regulations or policies that apply to Maxwell worldwide. Reporting a known or suspected violation of this Code by others will not be considered an act of disloyalty, but an action to safeguard the reputation and integrity of Maxwell Technologies, Inc. and its employees.

***

**TRANSACTIONS**

> Various stakeholders, including shareholders, vendors, and those who purchase Maxwell products and devices, rely on Maxwell to be reliable and trustworthy in the way it carries out and documents its transactions. Maxwell is also required by law, including, specifically, securities laws, to maintain accurate books and records and a related system of internal controls. The policies described in this section govern Maxwell transactions and Maxwell employees' actions relating to those transactions to ensure that they will be carried out in a compliant manner and with reliability and integrity. Please also see other related Maxwell and local policies and procedures.

**FINANCIAL RESPONSIBILITY AND AUTHORIZATION**

> Each Maxwell employee must ensure that no false or intentionally misleading entries are made in Maxwell's accounting records. Intentional misclassification of transactions regarding accounts, departments, or accounting periods violate the law and the Code. All transactions must be supported by accurate documentation in reasonable detail, recorded in the proper account and in the proper accounting period.

> If any employee has concerns or complaints regarding questionable accounting, auditing or other financial records, he or she must report those concerns to the Audit Committee of the Board of Directors, the Compliance Department or the Maxwell Ethics Hotline.

> Employees must act with absolute financial and record-keeping integrity in processing travel and expense reports and other financial transactions. Employees must follow requirements regarding responsibility and approval for committing Maxwell financial or other resources. Cash or other assets must not be maintained in any unrecorded or "off-the-books" fund for any purpose. Compliance with Generally Accepted

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    10

Accounting Principles (GAAP) and the Company's system of internal controls is required at all times. Proper justification is required when alternative accounting treatment is possible under GAAP.

\*\*\*

## SECURITIES LAWS AND TRADING

Maxwell shares information openly with its employees. At times, we may receive confidential company information before it is made publicly available to ordinary investors. Some of that information may be considered significant, or "material", and could be important to an investor deciding to buy, sell or hold securities, such as Maxwell stock. Examples of information that could be material are:

• Information about possible business deals, such as a merger, purchase, sale or joint venture.

• Financial results or changes in dividends.

• Important management changes.

• Major raw material shortages or discoveries.

• Significant product or manufacturing process developments.

• Gain or loss of a significant customer or supplier.

• Major lawsuit or regulatory investigation.

• Any other information that may positively or negatively affect the stock price of Maxwell or any other company.

Do not use confidential information for personal benefit. Do not trade securities based on material inside information. Do not provide inside information to others. Employees may not purchase or sell Maxwell stock or transfer stock into or out of Maxwell stock funds in any company savings plan or other benefit plan during announced Trading Black-Out Periods. Even if you are not covered by formal blackout restrictions, you are encouraged to wait until at least 24 hours after material inside information has been publicly disclosed before trading to ensure the market has had an opportunity to absorb and evaluate the information.

28.    Similarly, the Director Defendants are required to comply with the Board Guidelines which states:

## I. Role of the Board of Directors

The Board of Directors (the "Board") of Maxwell Technologies, Inc. (the "Company") is elected by the Company's stockholders to oversee the Chief Executive Officer and other senior management in the competent and ethical operation of the Company on a day-to-day basis. To satisfy this duty, the members of the Board will take a proactive,

focused approach to their position, and set standards to ensure that the Company is committed to business success through maintenance of the highest standards of responsibility and ethics.

29.     The directors are expected to promote the best interests of the Company's stockholders in terms of corporate governance, fiduciary responsibilities, risk management, compliance with applicable laws and regulations, and maintenance of accounting, financial and other internal controls. Finally, the Company's Audit Committee Charter specifically provides that the members of the Audit Committee— defendants Guyett, Rossi, and Jorden—shall "assist the Board in fulfilling their oversight responsibility…relating to the Company's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the internal audit function, the annual independent audit of the company's financial statements, and the legal compliance and ethics programs as established by management and the Board."

30.     To that end, the Audit Committee's primary responsibilities and duties include, among other things, to:

**D. General Oversight Responsibilities**

1.     Review the content and clarity of all material communications with the public regarding changes in financial projections prior to their release.

2.     At least annually, review the Company's "critical accounting policies" with management and the independent auditors.

3.     Review major changes to the Company's auditing and accounting policies, principles and practices as suggested by the independent auditors or management.

4.     Obtain reports from management, and, if so determined by the Audit Committee, from the independent auditors that the Company's subsidiary/foreign affiliated entities are in conformity with applicable accounting and internal controls requirements and the Company's Code of Business Conduct and Ethics pertaining to such matters, including disclosures of insider and affiliated party transactions.

5.     Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material

issues regarding the Company's financial statements or accounting policies.

6.  Review with counsel legal compliance matters including corporate securities trading policies and other legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

7.  Oversee establishment and implementation of procedures for receiving, retaining and investigating reports of illegal acts pertaining to accounting or internal control matters involving the Company detected by the independent accountants or others and, in accordance with such procedures, supervise the investigation of such reports of illegal acts, review the actions taken or to be taken by the Company to remediate such illegal acts, and, if appropriate, recommend further action by the Board of Directors. Oversee establishment and implementation of procedures for the confidential, anonymous submission by employees of the Company and others of concerns or complaints regarding accounting or internal control matters and investigate any such concerns or complaints.

8.  Review and approve all related party transactions (as defined in Section 404 of Regulation S-K) involving the Company.

9.  Review and discuss with management and the independent auditors new or proposed accounting rules or pronouncements that may affect the Company. 10.   Review and update periodically concepts pertaining to accounting and internal controls topics within the Code of Business Conduct and Ethics and communicate same to the Governance Committee.

31.   Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Maxwell, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.   The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the

remaining Individual Defendants who collectively comprised all of Maxwell's Board during the Relevant Period.

32.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results as detailed herein, by failing to properly oversee the Company's business and operations, and by failing to prevent the Individual Defendants from taking such illegal actions. As a result, Maxwell has expended, and will continue to expend, significant sums of money, has suffered a severe drop in stock price, and has suffered a continued loss of reputation and goodwill.

## FACTUAL ALLEGATIONS

**Company Background**

33.    Maxwell develops, manufactures, and markets energy storage, power delivery and microelectronic products worldwide.

34.    The Company offers ultracapacitors, which are energy storage devices that provide energy storage and power delivery solutions for applications in the transportation, automotive, information technology, renewable energy, and industrial electronics industries; and CONDIS high-voltage capacitors comprising grading and coupling capacitors, and capacitive voltage dividers used to ensure the safety and reliability of electric utility infrastructure and other applications involving transport, distribution, and measurement of high-voltage electrical energy.

35.    Maxwell also provides radiation-hardened microelectronic products, including single-board computers and components, such as high-density memory and power modules for satellites and spacecraft applications.

36.    The Company markets and sells its products through direct and indirect sales for integration by original equipment manufacturers into a range of end products.   Maxwell was founded in 1965 and is headquartered in San Diego, California.

37.     In recent years, Maxwell has been a favorite of analysts focusing on the energy technology sector due to its place as an ultracapacitor manufacturer in the new world of electric automobiles and other high powered devices.  During the Relevant Period there were several positive news stories about the Company's prominent position in this emerging niche market.

**Individual Defendants Cause Maxwell to Make False and Misleading Statements**

38.     The Individual Defendants named herein breached their fiduciary duties by causing and allowing Maxwell to issue public statements which did not accurately portray Maxwell's true fiscal position and business prospects.

39.     During the Relevant Period, the Individual Defendants knowingly caused the Company to issue false and misleading statements about the Company's business and prospects.  In breach of their fiduciary duties of good faith and loyalty, and with respect to the members of the Audit Committee (Defendants Guyett, Jorden, and Rossi), their fiduciary responsibilities as members of the Audit Committee, the Individual Defendants willfully ignored the obvious and pervasive problems with the Company's financial statements, its accounting practices, and its lack of adequate internal and financial controls, and failed to make a good faith effort to correct the problems or prevent their recurrence.

40.     During the Relevant Period, the Individual Defendants knowingly caused the Company to make a series of false and misleading statements regarding the financial condition of the Company.  Specifically, the Individual Defendants caused or allowed the Company to conceal from its shareholders that its financial statements for fiscal years 2011 and 2012 contained significant errors and should no longer be relied upon.  The Individual Defendants also caused or allowed the Company to have a material weakness in its internal controls over financial reporting, and caused or allowed the Company to conceal the material weakness from

shareholders. This material weakness in internal controls over financial reporting was the cause of the errors in the financial statements for 2011 and 2012.

41. As a result of the materially false and misleading statements and the lack of internal controls, the Individual Defendants caused or allowed the Company to falsely inflate Maxwell's stock price and have subjected Maxwell to the Securities Class Action. In defending the Securities Class Action, Maxwell will continue to incur litigation costs, and is faced with substantial potential liability for violations of securities laws.

42. On April 28, 2011, Maxwell issued a press release announcing its first quarter 2011 financial results. Defendant Schramm, with the knowledge and explicit approval of Defendants Guyett, Jorden, and Rossi, caused the Company to issue a statement, read below in its pertinent part:

> "Energy storage solutions for wind turbine blade pitch systems and hybrid and electric transit vehicle drive systems continued to be primary drivers of ultracapacitor sales growth, along with increasing contributions from automotive stop-start idle elimination systems and various backup power applications," said David Schramm, Maxwell's president and chief executive officer. "This strong top line growth and ongoing cost reduction and efficiency improvements also enabled the company to continue improving operating results."
>
> * * *
>
> "We expect sequential top line growth of five to seven percent in the second quarter," Schramm said. "For the full year, we continue to expect top line growth of more than 20 percent over 2010, and steadily improving operating performance should enable the company to generate cash from operations and be profitable on a non-GAAP basis going forward."

43. That same day, after releasing its first quarter 2011 results, Maxwell hosted a conference call for analysts, media representatives, and investors in which Defendant Schramm stated the following:

> We are pleased to report that Maxwell reported total revenue of $35.3 million for the first quarter ended March 31, 2011. That's up 32% from the $26.6 million reported in the same period a year ago, that growth was driven mainly by strong ultracapacitor sales of $21.4 million, which is up 55% from the $13.8 million recorded in Q1 of 2010.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT 16

Sales of microelectronics and high-voltage capacitor products came in at $13.9 million for the quarter, up 8% from last year's first quarter and both of these legacy product lines continue to make important contributions to the Maxwell bottom line.

That sales growth across all three product lines along with continuing costs and efficiency improvements enable the company to show a small net profit for the quarter; that's a modest, but encouraging step toward our goal of sustainable and increasing profitability.

44.     With these statements, Defendant Schramm presented a bright picture of Maxwell's future, incorporating the falsely recognized revenue numbers into his positive outlook.

45.     On May 5, 2011, Maxwell filed its first quarter 2011 Form 10-Q, incorporating the results announced on April 28, 2011, with the SEC.  Defendants Schramm and Royal each signed the 10-Q and internal control certifications, affirming that they were duty-bound to design "such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," and that they had fulfilled their duty to report to the board and auditors "[a]ll significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

46.     On May 17, 2011, Defendant Rossi took was elected to replace Defendant Guyett as Chairman of the Company's Board of Directors.  Unfortunately, this change in control had no effect on the Board's failure to live up to its fiduciary duties and only seemingly facilitated the lack of internal controls and issuance of false and misleading statements.

47.     Flowing from the inflated positive financial disclosures of recent months, on May 24, 2011, Maxwell secured a large contract to supply ultracapacitors

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    17

for Flextronics Automotive's recuperation system for fuel-efficient, low-emission commercial vehicles.   In a press release announcing the contract, Defendant Schramm stated, "As this supply agreement demonstrates, Ultracapacitors' high efficiency, all temperature performance and long operational life make them a preferred storage solution for hybrid buses and other heavy, commercial and passenger vehicles."

48.   Maxwell provided more product-based positive information to shareholders on June 15, 2011, when it announced the launch of a new ultracapacitor product that could store energy while a commercial truck would otherwise be idling and allowed the engine to be completely shut off and then instantly turned back on when necessary.  Maxwell shared the preliminary marketing strategy with analysts in order to generate positive financial press regarding the product launch.

49.   On July 28, 2011, Maxwell issued a press release announcing its second quarter 2011 financial results.  The Company misleadingly reported a net loss of only $1.2 million, or ($0.04) diluted EPS, and revenue of $38.5 million for the second quarter ended June 30, 2011. Defendant Schramm, with the knowledge and explicit approval of Defendants Guyett, Jorden, and Rossi, caused the Company to issue a statement, read below in its pertinent part:

> "Rapidly increasing sales into stop-start idle elimination systems in micro hybrid autos and various backup power applications augmented continuing strong sales for wind turbine blade pitch systems and hybrid and electric transit vehicle drive systems to generate another record quarter for ultracapacitor sales," said David Schramm, Maxwell's president and chief executive officer.
>
> * * *
>
> "We expect sequential top line growth of five to seven percent in the third quarter," Schramm said. "For the full year, we continue to expect that year-over-year top line growth will exceed 20 percent, and steadily improving operating performance should enable the company to be profitable on a non-GAAP basis going forward."

50.     That same day, after releasing its results for the second quarter 2011 ended June 30, 2011, Maxwell hosted a conference call for analysts, media representatives, and investors in which Defendants Schramm and Royal stated the following:

DAVID SCHRAMM, PRESIDENT AND CHIEF EXECUTIVE OFFICER: Thank you, Mike and good afternoon everybody. We are pleased to report that Maxwell recorded total revenue of $38.5 million for the second quarter ended June 30, 2011. That's up 30% from the $29.6 million reported in the same period a year ago. That growth was driven mainly by strong ultracapacitor sales of $24.4 million. That's up 54% from the $15.9 million recorded in Q1 of 2010.

Sales of microelectronics and high-voltage capacitor products came in at $14 million for the quarter, up 2% from last year's first quarter and both of these mature product lines continue to make significant contributions to the Maxwell bottom line. That sales growth along with continuing costs and efficiency improvements enable the company to show a non-GAAP net profit of about $1.6 million for the quarter. Now, that's the fifth consecutive quarter that the company has been profitable on a non-GAAP basis. Kevin will provide more details on those and some other financial items in a few minutes.

\*\*\*

KEVIN ROYAL, CHIEF FINANCIAL OFFICER: Thank you, David. I'm going to spend a few minutes providing some additional information on our second quarter 2011 financial results. Our revenues were $38.5 million for the second quarter of 2011, up 9% from Q1 2011. The higher revenues in the second quarter were driven by the 14% sequential increase in ultracapacitor product sales, which generated $24.4 million in revenues for the quarter.

Revenues from our microelectronics products were down slightly this quarter, while our high voltage product revenues were up slight compared with Q1 2011. Non-GAAP gross profit was $15.7 million or 41% of revenues for the second quarter of 2011 compared to non-GAAP gross profit of $14.1 million or 40% of revenues for the first quarter of 2011. In the current quarter, non-GAAP gross profit reflected improvement in our gross profit as a percentage of sales on ultracapacitor products due to ongoing product cost reduction programs and higher volume. Non-GAAP gross profit excludes stock-based compensation expense and amortization of intangible assets. Our target non-GAAP gross profit as a percentage of revenues remains 40%.

Our operating expenses increased during Q2 2011. The increase in operating expenses were driven by a reserve of $2.6 million for the anticipated settlement of a legal – and higher than anticipated legal spending due to ongoing legal matters. These increases were offset in part by lower research and development expense due to lower project relating spending in Q2 2011 versus Q1 2011.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    19

Total non-GAAP operating expenses for Q2 2011 were $13.7 million compared with Q1 2011 non-GAAP operating expenses of $13.1 million. Non-GAAP operating expenses exclude stock-based compensation expense, amortization of intangible assets, and the expense associated with the anticipated legal settlement. We expect non-GAAP operating expense to range from $14 million to $14.5 million per quarter for the remainder of 2011. We have increased the outlook for operating expense due to anticipated spending on ongoing legal matters. These matters include the government ongoing review of the SCPA matter, which focuses on past offices, effort related to intellectual property protection and other corporate related matters. Our legal spending in the second quarter of 2011 was higher than historical levels and we anticipate this level of spending to continue through the remainder of the year.

We reported non-GAAP net income of $1.7 million or $0.06 per diluted share for the second quarter compared with non-GAAP net income of $161,000 million or $0.01 per diluted share for the first quarter 2011. Non-GAAP net income excludes stock-based compensation expense, amortization of intangible assets, the anticipated legal settlement and a gain on embedded derivatives. Our earnings before interest expense, taxes, depreciation and amortization, or EBITDA was $929,000 in Q2, a $3.5 million excluding the expense for anticipated legal settlement compared to $2.5 million in Q1.

Now, I'd like to turn to the balance sheet. We ended the quarter with cash of $29.8 million, which represents a decrease in cash of $3.3 million from Q1, 2011. The significant components of our cash activity for the quarter include capital spending of $4.4 million offset by favorable effects on cash from changes in exchange rates of $1.6 million. Cash used in operations in Q2 was approximately $238,000 and the increase in accounts payable was offset by consumption of cash related to inventory growth and increased accounts receivable balances. The increase in accounts receivable is due to sales growth and shipment linearity in the second quarter of 2011 with 57% of shipments falling in the final month of the quarter. While our cash balances are lower at the end of Q2, this is driven by investment and capital equipment and facilities as well as an increase in inventory to support Q3 sales.

51.    On August 8, 2011, Maxwell filed its second quarter 2011 Form 10-Q, incorporating the results announced on July 28, 2011,  with the SEC. Defendants Schramm and Royal once again affirmed their duties to maintain adequate internal controls over financial reporting and to insure the accuracy of the financial statements by signing the Form 10-Q and internal control certifications.

52.    On September 12, 2011, Maxwell announced that it had entered into a contract with China's largest bus manufacturer, Zhengzhou Yutong Bus Company,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    20

Ltd. to provide ultracapacitors for energy storage and power delivery in fuel-efficient, low-emission, diesel-electric hybrid buses for public transit agencies across the globe.

53.   On November 3, 2011, Defendant Schramm, with the knowledge and explicit approval of Defendants Guyett, Jorden, and Rossi, caused the Company to issue a press release announcing its third quarter 2011 financial results.   The Company reported net income of $298,000, or $0.01 diluted EPS, and revenue of $41.1 million for the third quarter ended September 30, 2011.   In the release Defendant Schramm stated in part:

> "Strong demand for ultracapacitor products across multiple applications, including stop-start idle elimination systems in micro hybrid autos, backup power, wind turbine pitch control and power quality, and hybrid and electric transit vehicle drive systems continued to drive sales growth,"

> * * *

> "We expect sequential top line growth of approximately three to five percent in the fourth quarter, which would bring total top line growth to nearly 30 percent for the full year," Schramm said. "Although we anticipate normal seasonal softness early next year, we believe that sales for the full year will grow at a rate similar to what we have seen in 2011, and ongoing operating performance improvement should enable the company to be profitable on a non-GAAP basis going forward."

54.   On the same day, after releasing the results for the third quarter 2011, Maxwell hosted a conference call for analysts, media representatives, and investors in which Defendants Schramm and Royal stated the following:

> DAVID SCHRAMM: Very good Mike, and thank you, and good afternoon, everybody. We are pleased to report that Maxwell recorded total revenue of $41.1 million for the third quarter ending September 30, now that's up 31% from the same period a year ago. That growth was mainly driven by strong ultracapacitor sales of $24.9 million. Now that's up 3% from Q3 of 2010.

> Sales of microelectronics and the high-voltage capacitor products came in at $16.2 million for the quarter, up 26% from last year's first quarter. That's higher than usual for these mature product lines with boats continue to deliver solid contributions to our bottom line. This growth, along with continuing costs and efficiency improvements enable the company to show a non-GAAP net profit of about $1.2 million for the quarter. That's the sixth consecutive quarter that Maxwell has been profitable on a non-GAAP basis. So our products aren't just contributing to a greener world, but also delivering another kind of green to the

bottom line. Kevin will provide more financial details on all this in a few minutes.

\*\*\*

KEVIN ROYAL: Thank you, David. I will now spend a few moments discussing financial highlights for third quarter 2011. Our revenues were 41.1 million up 7% from Q2 2011. This quarter, higher revenues were driven by growth in our high-voltage business, related to an increase in shipments and favorable currency exchange rates. Sales of our ultracapacitor product were up slightly quarter-over-quarter, as we continued to achieve substantial growth in the bus and automotive markets, while sales in the wind sector were down, primarily associated with a slowdown of the wind market in China.

Non-GAAP gross profit was $16.7 million or for the third quarter of 2011 compared to non-GAAP gross profit of $15.7 million for the second quarter of 2011. For both the second and third quarters, we achieved a non-GAAP gross profit margin of 41%, as continued to focus on cost reduction and gross profit improvement. We continue to focus on reducing the cost of our ultracapacitors products through material cost reduction, design improvement, and manufacturing productivity improvements.

Non-GAAP gross profit excludes stock-based compensation expense and amortization of intangible assets. Non-GAAP operating expenses increased from 13.7 million in Q2 2011 to 14.6 million in Q3 2011. The increase in operating expenses was driven by higher legal, audit, and travel cost. Non-GAAP operating expenses exclude stock based compensation expense, amortization of intangible assets, and in Q2 2011 expense associated with an anticipated legal settlement.

Last quarter we increased the outlook for non-GAAP operating expenses from $14 million to $14.5 million per quarter for the remainder of 2011, due to anticipated spending on on-going legal matters.

In the third quarter, non-GAAP operating expenses were in line with that outlook. Currently, we anticipate continued higher than normal legal spending, and additional spending in sales, and marketing, and research and development during the fourth quarter. Due to this, we anticipate that non-GAAP operating expenses will be in the range of 14.5 to 15 million for the fourth quarter of 2011.

Non-GAAP income from operations was up slightly quarter-over-quarter to 2.1 million for Q3 2011 compared to 1.9 million for Q2 2011. However, we incurred a higher tax expense in Q3 2011 compared to Q2 due to higher profits from our Swiss subsidiary. Therefore non-GAAP net income was down quarter-over-quarter at 1.2 million or $0.04 per diluted share for the third quarter 2011, compared with non-GAAP net income of 1.7 million or $0.06 per diluted share for the second quarter of 2011.

Non-GAAP income from operations and non-GAAP net income excludes stock-based compensation expense, amortization of intangible assets, and the Q2 2011 expense for the anticipated legal settlement.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    22

> Now, I'd like to turn to the balance sheet. We ended the quarter with cash of 31 million, which represents an increase in cash of 1.2 million from second quarter 2011. This quarter, we generated 5.9 million in cash from operations, while we invested 3.7 million in capital spending.
>
> Cash generated from operations in Q3 related primarily to our net income of 298,000 which included net non-cash charges of 2.2 million, and a decrease accounts receivable balances of 3.2 million as we achieved strong collections during the third quarter.

55.     On November 4, 2011, based on the statements listed above, Maxwell's stock price reached its Relevant Period high of $21.20 per share.

56.     On November 7, 2011, Maxwell filed its third quarter 2011 Form 10-Q, incorporating the results announced on November, 2011, with the SEC.  Defendants Schramm and Royal one again affirmed their duties to maintain adequate internal controls over financial reporting and to insure the accuracy of the financial statements by signing the Form 10-Q and internal control certifications.

57.     Following a significant dip in stock price in late November from its Relevant Period high, on December 5, 2011, Maxwell entered into a Credit Agreement with Well Fargo Bank, N.A. for a $15 million revolving line of credit and an equipment term loan of $12.5 million.

58.     On January 19, 2012, the Company announced that Bombardier Transportation, a leading producer of rail vehicles and rail transportation equipment, systems, and services, selected Maxwell's ultracapacitors for a new train braking energy recuperation system.

59.     On January 31, 2011, Maxwell settled a criminal complaint filed by the SEC and United States Department of Justice ("DOJ") and a civil complaint filed by the SEC for violations of the Foreign Corrupt Practices Act ("FCPA").  Maxwell agreed to pay an $8 million criminal penalty and $5.654 million in disgorgement of profits to resolve the matter.  The SEC civil complaint alleged violations of the books and records and internal controls provisions of the FCPA when the Company repeatedly paid bribes to Chinese officials in order to obtain and retain sales

1  contracts.  The SEC and DOJ's complaints further alleged that the illicit payments

2  were made with the knowledge and approval of Maxwell's executives and that

3  Maxwell failed to accurately record the payments on its books and records and failed

4  to implement or maintain a system of effective internal accounting controls and failed

5  to prevent the payments.  This investigation and the costly settlement of its claims

6  should have put the Individual Defendants on notice that Maxwell had systemic

7  problems with internal controls over financial reporting, but the Company continued

8  to let its financials run amok and continued to release false and misleading statements

9  through the remainder of the Relevant Period.

10      60.    Based on the inaccurate financial statistics included in the statements

11  listed above made during the Relevant Period, on February 7. 2012, the

12  Compensation Committee of the Board of Directors of Maxwell approved increases

13  in the base salaries and cash bonuses for Maxwell's named executives.  Defendants

14  Guyett, Howsmon, and Rossi (Chairman) were members of the Compensation

15  Committee and explicitly approved these decisions.  The Compensation Committee

16  increased Defendant Schramm's base salary from $495,000 to $512,325, additionally

17  the Committee awarded him a $400,000 incentive based annual bonus, 37,240

18  restricted share awards ("RSA") as long-term incentive awards, and a targeted bonus

19  of $512,325.  The Compensation Committee increased Defendant Royal's base salary

20  from $311,000 to $322,922 and awarded him a $135,774 incentive based annual

21  bonus, 15,046 RSA as long-term incentive awards, and a $161,461 targeted bonus.

22  The Compensation Committee increased Defendant Kreigler's base salary from

23  $318,270 to $326,863 and awarded him a $135,212 incentive based annual bonus,

24  15,393 RSA as long-term incentive awards, and a $163,432 targeted bonus.  The

25  Compensation Committee increased Defendant Andrews' base salary from $252,000

26  to $277,200 and awarded him a $115,680 incentive based annual bonus, 12,188 RSA

27  as long-term incentive awards, and a $138,600 targeted bonus.

28

1    61.    The Compensation Committee increased the base salaries based on its

2  authority set out in the Compensation Committee Charter.

3    62.    The Compensation Committee issued the incentive based annual

4  bonuses based on the Company's 2011 cash incentive bonus program.    The

5  Company's April 1, 2011 definitive proxy statement states:

6       The Compensation Committee retains a degree of discretion with respect
7       to our annual cash incentive bonus program, and uses multiple
        performance objectives in that program, which minimizes the risk that
8       might be posed by the short-term variable component of our
        compensation programs

9    63.    The Compensation Committee approved the long-term incentive awards,

10 in the form of RSA under the Company's 2005 Omnibus Equity Incentive Plan.  The

11 criteria for incentive awards in the 2005 Omnibus Equity Incentive Plan is set forth in

12 the Company's April 5, 2005 definitive proxy statement as follows:

13      Performance targets may include minimum, maximum and target levels
        of performance, with the size of the award or vesting based on the level
14      attained. Performance measures are criteria established by the
        Compensation Committee relating to any of the following, as it may
15      apply to an individual, one or more business units, divisions or
        subsidiaries, or on a company-wide basis, and either in absolute terms or
16      relative to the performance of one or more comparable companies or an
        index covering multiple companies: income from operations; revenue;
17      earnings before interest, taxes, depreciation and amortization, as adjusted
        (EBITDA as adjusted); income before income taxes and minority
18      interests; operating income; pre- or after-tax income; average accounts
        receivable; cash flow; cash flow per share; net earnings; earnings per
19      share; return on equity; return on invested capital; return on assets;
        growth in assets; economic value added; share price performance; total
20      stockholder return; improvement in or attainment of expense levels;
        relative performance to a group of companies or relevant market indices
21      comparable to the Company; and strategic business criteria consisting of
        one or more objectives based on our meeting specified goals relating to
22      revenue, market penetration, business expansion, costs or acquisitions or
        divestitures. The Compensation Committee can select other goals not
23      listed here for awards that are not intended to meet the requirements of
        "qualified performance-based compensation."
24

25    64.    The Compensation Committee approved the targeted bonuses for

26 Defendants Schramm, Royal, Kreigler, and Andrews under the Company's 2012

27 bonus plan.  The Company's Form 8-K filed February 7, 2012 with the SEC states:

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                          25

The 2012 bonus plan for each named executive officer consists of three components related to the achievement of certain performance goals as follows: 50% of the target bonus amount relates to the achievement of revenue metrics, 25% relates to the achievement of gross profit metrics, and 25% relates to the achievement of operating income metrics. The performance goals will be paid out on a sliding scale subject to meeting a minimum threshold performance level.

65.     All of the awards granted on February 7, 2012 were based on the financial statements released during the Relevant Period, which Maxwell has now publicly stated are inaccurate and not to be relied upon.   The payment of this additional, unearned, incentive based compensation to the Officer Defendants directly damaged Maxwell.

66.     Almost immediately after the Executive Directors were granted generous annual bonuses and incentive based compensation, Maxwell completed a settlement in a shareholder derivative suit arising from the FCPA investigation by the SEC and DOJ.   There were multiple shareholder derivative suits filed in August 2010 and consolidated into *Loizides v. Schramm, et al.*, Case No. 37-2010-00097953-CU-BT-CTL (the "FCPA Derivative Action").   The complaint alleged breaches of fiduciary duty of loyalty and unjust enrichment against the directors and officers of Maxwell for violations of the FCPA and the failure to cause Maxwell to implement internal controls and systems of compliance with FCPA.

67.     The settlement of the FCPA Derivative Action directly damaged Maxwell to the extent of $3,000,000 in fees and required the Maxwell to implement several corporate governance measures.   These measures included the granting of new authority to the Audit Committee:

(i) The Audit Committee shall have the authority and responsibility acting by majority vote to take all appropriate action, including notifying the Securities and Exchange Commission ("SEC") if Maxwell fails in any material respect to implement an appropriate response that the Committee has recommended that the Company take; and

(ii) The Audit Committee shall have the authority to retain an independent law firm, as well as any independent analytic resources deemed beneficial to the Committee.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    26

68.    Like the SEC and DOJ settlement just weeks earlier, the costly settlement of the FCPA Derivative Action should have put the Individual Defendants on notice that Maxwell had deeply-rooted problems with internal controls over financial reporting, but the Company continued to let its financials run amok and continued to release false and misleading statements through the remainder of the Relevant Period.

69.    On February 16, 2012, Defendant Schramm, with the knowledge and explicit approval of Defendants Guyett, Jorden, and Rossi, caused Maxwell to issue a press release announcing its fourth quarter and fiscal year ended 2011 financial results.  The Company misleadingly reported net income of $1.6 million, or $0.06 diluted EPS, and revenue of $42.5 million for the fourth quarter ended December 31, 2011. Further, the Company reported net income of $849,000, or $0.03 diluted EPS, and revenue of $157.3 million for the fiscal year ended December 31, 2011. In the release, Defendant Schramm stated in part:

> "Emerging ultracapacitor applications in backup power and stop-start idle elimination systems in micro hybrid autos augmented ongoing contributions from established customer bases in wind energy and hybrid bus drive systems to drive steadily increasing sales growth in 2011.We have also introduced new products for the uninterruptible power supply (UPS) and engine starting markets that we expect to drive additional growth in the coming year."
>
> * * *
>
> "Considering the impact of the Chinese New Year holidays and historic seasonality, we expect revenue to be lower by as much as five percent sequentially in the current first quarter compared with that reported in the fourth quarter. However, as previously stated, for the full year, we expect sales to grow at a rate similar to that experienced in 2011, and steadily improving operating performance should enable the Company to continue to be profitable on a non-GAAP basis."

70.    On February 16, 2012, Maxwell filed its 2011 Form 10-K with the SEC. Defendants Schramm and Royal once again affirmed their duties to maintain adequate internal controls over financial reporting and to insure the accuracy of the

financial statements by signing the Form 10-K and internal control certifications, which stated in relevant part:

> *Assumptions and Approach Used.* Product revenue is recognized when all of the following criteria are met: (1) persuasive evidence of an arrangement exists (upon contract signing or receipt of an authorized purchase order from a customer); (2) title passes to the customer at either shipment from our facilities or receipt at the customer facility, depending on shipping terms; (3) price is deemed fixed or determinable and free of contingencies or significant uncertainties; and (4) collectability is reasonably assured. Customer purchase orders and/or contracts are generally used to determine the existence of an arrangement. Shipping documents are used to verify product delivery. We assess whether a price is fixed or determinable based upon the payment terms associated with the transaction. If a volume discount is offered, revenue is recognized at the lowest price offered to the customer. We assess the collectability of accounts receivable based primarily upon creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

71.     In stark contrast to the stipulated facts in the settlement agreements for FCPA actions brought by the SEC and DOJ and the shareholders in the FCPA Derivative Action, the Company's 2011 Form 10-K stated that internal controls over financial reporting were effective as follows:

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Because of its inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or because the degree of compliance with policies or procedures may deteriorate. Based on our evaluation under the framework in *Internal Control—Integrated Framework*, management concluded that our internal control over financial reporting was effective as of December 31, 2011.

McGladrey & Pullen LLP, the independent registered public accounting firm that audited the consolidated financial statements of Maxwell in this Annual Report on Form 10-K, has issued an unqualified opinion on the effectiveness of Maxwell's controls over financial reporting as of December 31, 2011 which is included in this Item under the heading "Report of Independent Registered Public Accounting Firm."

72.    On the same day, after releasing the results for the fourth quarter 2011 and the end of year 2011, Maxwell hosted a conference call for analysts, media representatives, and investors in which Defendants Schramm and Royal stated the following:

DAVID SCHRAMM: Very good, Mike, thank you very much, and good afternoon, everybody. We're really pleased to report that Maxwell reported total revenue of $42.5 million for the fourth quarter ended December 31, 2011. Now, that's up 24% from the same period a year ago.

That growth was driven mainly by strong ultracapacitor sales of $26.2 million. That's up 30% from Q4 of 2010. Sales of our microelectronics and high-voltage capacitor products came in at $16.3 million for the quarter, up 16% from last year's fourth quarter. That's higher than usual for these mature product lines, which both continue to deliver solid contributions to the Maxwell bottom-line.

This growth along with continuing cost and efficiency improvements enable the company to show a net profit of about $1.5 million for the quarter. On a non-GAAP basis, net profit for Q4 was $1.7 million, and this was the seventh consecutive quarter that Maxwell has been profitable on a non-GAAP basis. Total sales for the year came in at $157.3 million, up 29% from fiscal 2010. GAAP net income for the full year was nearly $0.75 million and the net was nearly $5 million on a non-GAAP basis. Kevin will provide a little more detail on that in a few minutes.

***

KEVIN ROYAL: Thank you, David. I'm going to spend a few minutes providing some additional information on our 2011 financial results. Our revenues of $42.5 million for the fourth quarter of 2011 were up 3% from Q3 2011. The higher revenues in the fourth quarter were driven by a 5% increase in ultracapacitor product sales which generated $26.2 million in revenues for the quarter.

Despite what we believe to be a temporary slowdown in the wind market through regulatory changes in China, we continue to grow our sales in the bus, auto and uninterrupted power supply market. Revenues from our microelectronics and high-voltage business were relatively flat compared to Q3 2011.

Non-GAAP gross margin was $16.3 million or 38% of revenues for the fourth quarter of 2011 compared to non-GAAP gross margin of $16.7

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                          29

million or 41% of revenues for the third quarter of 2011. The decline in non-GAAP gross margin was primarily related to our microelectronics business. In the fourth quarter, we recorded a loss on the sale of 14 singleboard computers for a single customer due to significantly higher than expected manufacturing cost on this particular contract. Non-GAAP gross margin excludes stock-based compensation expense and amortization of intangible assets.

Total non-GAAP operating expenses for Q4 2011 were $13.8 million compared with Q3 2011 non-GAAP operating expenses of $14.6 million. Operating expenses were lower in Q4 2011 compared with Q3 2011 due to lower spending on legal matters, lower contract R&D spending and a lower fourth quarter bonus accrual as certain objectives were not achieved for the full year. Non-GAAP operating expenses exclude stock-based compensation expense, amortization of intangible assets and expense associated with an anticipated legal settlement.

We reported non-GAAP net income of $1.9 million or $0.07 per diluted share for the fourth quarter compared with non-GAAP net income of $1.2 million or $0.04 per diluted share for the third quarter of 2011. For the full year, non-GAAP net income was $4.9 million or $0.17 per diluted share for 2011 compared with $1.3 million or $0.05 per diluted share for 2010. Non-GAAP net income excludes stock-based compensation expense, amortization of intangible assets, expense associated with accruals for legal settlement, the gain on embedded derivatives and warrants in 2010 and the impact of reclassification of assets from held-for-sale to held-and-used in 2010.

Our earnings before interest expense, taxes, depreciation, amortization and stock-based compensation or EBITDA was $5 million in Q4 compared to $3.4 million in Q3. For the full year, EBITDA was $11.7 million in 2011 compared with $2.7 million in 2010.

Now I'd like to turn to the balance sheet. We ended the quarter with cash and cash equivalent of $29.3 million, which represents a decrease in cash of $1.7 million from Q3 2011. Although we did generate cash from operations of $2 million in the fourth quarter, we spent $3.5 million in capital investments and also experienced unfavorable effects from exchange rates on cash of $500,000.

73.    Even after Maxwell's large settlements related to inadequate internal controls in the preceding months, on March 19, 2012, Maxwell was selected by Bloomberg New Energy Finance as a 2012 New Energy Pioneer.  This award was in part based on the false and misleading statements made by Maxwell during the relevant period.  Much of the "momentum" referred to below was based on inaccurate financial data. According to the press release, the program is described as follows:

The Bloomberg New Energy Finance Pioneers program identifies companies from around the world that are changing the energy

landscape forever. An independent panel of industry experts from banking, academia, corporations, utilities and technology providers chose the honorees by assessing them against three criteria: potential scale, innovation and momentum.

74.   On April 6, 2012 Defendant Kreigler resigned from his position as Chief Operating Officer of Maxwell.  As part of his separation agreement, the Company agreed to pay Defendant Kreigler a lump sum severance payment of $190,670.08, which is equal to seven months of his base salary, pay COBRA premiums under the Company's health care plan on Defendant Kreigler's behalf for six months, and provide continued vesting of certain stock options for six months.  Defendant Kreigler departed from the Company shortly after the settlements regarding improper internal controls with regard to the FCPA.  His severance pay was another direct damage to the Company as a result of its lack of adequate internal controls over financial accounting.  From April 6, 2012 to the present, Maxwell has conducted business without a Chief Operating Officer.

75.   On April 26, 2012, Defendant Schramm, with the knowledge and explicit approval of Defendants Guyett, Jorden, and Rossi, caused Maxwell to issue a press release announcing first quarter 2012 financial results. The Company reported net income of $504,000, or $0.02 diluted EPS, and revenue of $39.2 million for the first quarter ended March 31, 2012. The release stated in part:

"Ultracapacitor revenue was down sequentially from Q4, due in part to seasonal factors, including the Chinese New Year observance," said David Schramm, Maxwell's president and chief executive officer. "Continued demand for ultracapacitor-based energy storage systems to power hybrid electric transit buses helped to offset softness in other applications. That, along with ongoing order flow for backup power applications and stop-start idle elimination systems in micro hybrid autos enabled us to sustain year-over-year growth."

* * *

"We expect revenue to increase by 4 to 7 percent sequentially in the current second quarter compared with that reported in the first quarter," Schramm said. "On the basis of reduced forecasts from customers in Europe and elsewhere, we now anticipate top line growth for the full year to be in the range of 15 to 20 percent, and continuing solid operating performance should enable the company to be profitable on a non-GAAP basis."

76.     On the same day, after releasing the results for the first quarter 2012, Maxwell hosted a conference call for analysts, media representatives, and investors in which Defendants Schramm and Royal stated the following:

DAVID SCHRAMM: Maxwell recorded total revenue of $39.2 million for the first quarter ended March 31, 2012. Now, that's up 11% from the same period a year ago. That growth was driven not only by ultracapacitor sales of $22 million, which is up 3% from Q1 '11, but also by unusually strong sales of microelectronics and high-voltage capacitor products, which came in at $17.2 million, which is up 24% from last year's first quarter.

This growth, along with continuing cost and efficiency improvements, enabled the company to show a net profit of about $500,000 for the quarter. On a non-GAAP basis, net profit for Q1 was $1.8 million.

Now, this was the eighth consecutive quarter that Maxwell has been profitable on a non-GAAP basis. Kevin's going to provide some more financial details on this in a few minutes. As noted in our press release, ultracapacitor sales were lower sequentially compared with the fourth quarter. This was mainly due to normal seasonal factors including the Chinese New Year observance, which effectively shuts down business across much of Asia for two to three weeks every year.

***

KEVIN ROYAL: Thank you David. I'm going to spend a few minutes providing some additional information on our first quarter 2012 financial results.

Our revenues were $39.2 million for the first quarter of 2012, down 8% from Q4 2011. The ultracapacitor product line sales declined by 16%, compared with Q4 2011. The Chinese New Year holiday and overall historical seasonal softness typically impact our top line results in the first quarter of each year. In addition, we experienced some minor slowing in Europe during the quarter, and we have received feedback from European customers that the slowing may continue for the foreseeable future.

As a result, we have modified our revenue expectations for the full year to a range of 15-20% overall revenue growth for 2012. While our ultracapacitor product sales were down, our microelectronics product sales grew by 21% compared with Q4 2011, and revenues from our high voltage products remain flat quarter over-quarter.

Non-GAAP gross profit was $16.3 million in both the first quarter and Q4 2011. As a percentage of revenue, non-GAAP gross profit was 41% of revenues for the first quarter of 2012, compared to 38% of revenues for the fourth quarter of 2011.

In the current quarter, non-GAAP gross profit was positively impacted by favorable product mix associated with increased contribution from

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          32

our high voltage and microelectronics products. In addition, in the fourth quarter of 2011 we recorded a loss on the sale of 14 single board computers with our microelectronics product line, which negatively impacted our gross profit rate.

We expect gross profit to decline in Q2 2012 to approximately 39%, due to product mix, and then return to target levels of 40% or above for the remainder of the year. Total non-GAAP operating expenses for Q1 2012 were in line with the prior sequential quarter, totaling $13.7 million for Q1 2012 compared with $13.8 million for Q4 of 2011.

We expect non-GAAP operating expenses to grow by a range of $800,000 to $1 million in Q2 2012 and to further increase in Q3 and Q4 to a run rate of approximately $16 million in support of our forecasted revenue increase in the latter half of the year.

Non-GAAP net income was $1.8 million, or $0.07 per diluted share, for the first quarter, compared with non-GAAP net income of $1.9 million, or $0.07 per diluted share, for the fourth quarter of 2011. Non-GAAP net income excludes stock based compensation expense and amortization of intangible assets.

Our earnings before interest expense, taxes, depreciation, and amortization, or EBITDA, was $4.4 million in Q1 compared to $5 million in Q4.

Now I'd like to turn to the balance sheet. We ended the quarter with cash of $30.6 million, which represents an increase in cash of $1.3 million from Q4 2011. The significant components of our cash activity for the quarter include $10.3 million raised under our shelf registration statement, $5 million in net borrowings, $5.5 million in settlement payments made to the SEC and DOJ, capital spending of $4.1 million, and a combined increase in accounts receivable and inventories of $9.8 million.

The increase in accounts receivable was primarily due to an increase in day's sales outstanding and the increase in inventory that's associated with anticipated future product demand. In addition, accounts receivable include the $2.9 million insurance receivable from our D&O insurance carrier at the end of Q4 2011 and Q1 2012, related to the derivative lawsuit which was paid to the plaintiff's attorneys in the second quarter and will not be included in accounts receivable at the end of Q2 2012. We have one remaining payment to the DOJ of $2.25 million related to the FCPA matter, which is fully accrued and will be paid in the first quarter of 2013.

During the quarter, we generated $10.3 million in net proceeds from the sale of approximately 573,000 shares of Maxwell's common stock, at an average price of $18.60. As previously announced, we had entered into an at the market equity offering sales agreement with Citadel Securities LLC in February 2012, under which we may offer and sell up to $30 million in shares of our common stock. We expect to continue to opportunistically sell shares under this program in future quarters.

> In addition, during the quarter we drew down $5 million from our credit facility to fund recent capital expenditures as we continue to focus on expanding our production capacity.

77.     Following this disclosure of disappointing results, Maxwell's stock declined from $15.80 per share to as lows as $8.81 per share before closing at $9.60 per share, on volume of 7.29 million shares.  However, Maxwell's stock continued to trade at artificially inflated levels as defendants continued to conceal the Company's improper revenue recognition and deficient internal controls.

78.     On April 26, 2012, Maxwell filed its first quarter 2012 Form 10-Q with the SEC.   Defendants Schramm and Royal once again affirmed their duties to maintain adequate internal controls over financial reporting and to insure the accuracy of the financial statements by signing the Form 10-Q and internal control certifications.

79.     On May 10, 2012, Maxwell entered into a global distribution agreement with Digi-Key Corporation.   In the press release, Defendant Andrews expressed excitement at the internet platform for global sales that Digi-Key would provide the Company.

80.     On August 2, 2012, Defendant Schramm, with the knowledge and explicit approval of Defendants Guyett, Jorden, and Rossi, caused Maxwell to issue a press release announcing its second quarter 2012 financial results. The Company once again reported inflated net income of $2.7 million, or $0.09 diluted EPS, and revenue of $40.9 million for the second quarter ended June 30, 2012. The release stated in part:

> "Slowing demand in Europe has impacted ultracapacitor revenue growth through the first half of the year, and the outlook there remains uncertain," said David Schramm, Maxwell's president and chief executive officer. "On the plus side, careful expense controls, strong demand for ultracapacitor products for hybrid electric transit buses and wind turbine blade pitch systems in China and steady performance by our high voltage and microelectronics groups have enabled us to continue growing and improving bottom line performance in a difficult economic environment."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    34

* * *

"Based on current order flow and customer forecasts in our core ultracapacitor market segments, we expect sequential top line growth of seven to 10 percent in the third quarter," Schramm said. "That should keep us on track to achieve growth in the range of 15 to as much as 20 percent for the full year and support ongoing improvement in operating performance."

81.     On August 2, 2012, Maxwell filed its second quarter 2012 Form 10-Q with the SEC. As usual, Defendants Schramm and Royal affirmed their duties to maintain adequate internal controls over financial reporting and to insure the accuracy of the financial statements by signing the Form 10-Q and internal control certifications.

82.     On the same day, after releasing the results for the first quarter 2012, Maxwell hosted a conference call for analysts, media representatives, and investors in which Defendants Schramm and Royal stated the following:

DAVID SCHRAMM:  We're pleased to report that Maxwell recorded total revenue of $40.9 million of the second quarter into June 30th, 2012. Well, that's 12% sequentially from the first quarter and up 6% from the same quarter a year ago.

Ultracapacitor sales totaled $24.2 million, up 10% sequentially from the first quarter, but down slightly from the second quarter of 2011 due mainly to continuing soft demand in Europe. Second quarter sales of microelectronics and high voltage capacitor products came in at $16.7 million, down a bit from the unusually high sales posted in the first quarter, but up 19% from last year's second quarter.

A particular note is that despite the challenging global economic environment, a favorable revenue mix and careful expense control enable the company to post net income of $2.7 million or $0.09 per share for the quarter. That compares with the loss of $0.04 per share in the same period last year. On a non-GAAP basis, net profit for Q2 was $3.5 million or $0.12 per share compared with $0.06 per share in Q2 last year.

Now, this was the ninth consecutive quarter the company has been profitable on a non-GAAP basis. And Kevin is going to provide you more financial details on all of this in a few minutes.

***

KEVIN ROYAL: Thank you, David. I'm going to spend a few minutes providing some additional information on our second quarter 2012 financial results.

Our revenues were $40.9 million for the second quarter of 2012, up 4% from Q1 2012. The higher revenues in the second quarter were driven by a 10% sequential increase in ultracapacitor product sales. It generated $24.2 million in revenues for the quarter. Continued strong demand for ultracapacitor products for hybrid electric vehicles in wind turbine blade fit systems were the main drivers of this quarter's growth.

We continued to experience slowing demand in Europe during the quarter, which we believe may continue for the foreseeable future. Revenues from our microelectronics business were down slightly this quarter, while our high-voltage product revenues were essentially flat compared to Q1 2012. Based on current order flow and customer forecast we now expect revenue for the full year to be in a range of 15% to as much as 20%.

Non-GAAP gross profit was $17.3 million in the second quarter of 2012 compared to $16.4 million in Q1 of 2012. As a percentage of revenue, non-GAAP gross profit was 42% of revenues for the second quarter of 2012 compared to 41% of revenues for the first quarter of 2012. The increase in gross margin is due primarily to product mix as well as continuing cost reductions for ultracapacitor products.

Total non-GAAP operating expenses for Q2 2012 were $12.9 million, down from $13.7 million for Q1 2012. Although we had anticipated non-GAAP operating expenses to grow by a range of $800,000 to a $1 million in Q2 2012, expense control measures have allowed us to decrease our overall spending. We expect a quarterly run rate of $14.5 million for non-GAAP operating expenses for Q3, increasing to approximately $15.5 million in Q4 in support of our forecasted revenue increase in those quarters.

Non-GAAP net income was $3.5 million or $0.12 per diluted share for the second quarter compared with non-GAAP net income of $1.9 million or $0.07 per diluted share for the first quarter of 2012. These non-GAAP measures exclude stock-based compensation expense and amortization of intangible assets. Our earnings before interest expense, taxes, depreciation and amortization or EBITDA was $5.2 million in Q2 compared to $3.2 million in Q1.

Now I'd like to turn to the balance sheet. We ended the quarter with cash of $22.3 million, which represents a decrease in cash of $8.3 million from Q1 2012. The significant components of our cash activity for the quarter included increase in accounts receivable, a $5.6 million in capital spending of $4.2 million. The increase in accounts receivable is primarily attributable to shipment linearity, where a significant portion of the quarter sales were shipped in the third month of the quarter and also to a few significant customer accounts that are past due but which we expect to collect.

We expended $4.2 million in capital investments during the quarter as we continue to invest in capacity expansion and product development for ultracapacitor products. As of June 30, 2012, we have $10.3 million in debt obligations outstanding. This debt balance consists of an equipment term loan of $4.9 million and debt of $5.4 million held by our Swiss subsidiary, which has favorable borrowing terms.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                          36

83.     On August 14, 2012, Defendant Royal spoke at the Canaccord Genuity 32nd Annual Growth Conference.   Defendant Royal gave several false and misleading statements about the Company's revenue, including:

> So, first of all, a little bit about Maxwell. Today the company consists of three different product groups, ultracapacitors, our microelectronics product group and our high-voltage capacitors. And we'll spend just a little bit of time on microelectronics and high-voltage. But the majority of this presentation will be focused on our growth area which is ultracapacitors.

> So first, our high-voltage capacitors, these are very large devices that are used in power distribution and transmission applications. These are designed and manufactured by our wholly owned subsidiary in Rossens, Switzerland, and our revenues for 2011 were just a bit north of $42 million.

> Our microelectronics product group, these are electronics components in single-board computers that are designed and built to withstand the harsh effects of space environments. So, they're basically radiation-mitigated parts that allow them to withstand the radiation effects of flying in satellites and other space applications. This is a niche product, very profitable for the company, and our revenues in 2011 were $18 million for these products.

> So, as I mentioned, ultracapacitors will be the focus of the presentation. This is the growth area for the company. Today, we're in many applications and that list continues to grow. We'll cover some of these applications a little bit later in the presentation. Our revenues for this product group in 2011 were $97 million.

84.     On October 2, 2012, Maxwell announced that Automobili Lamborghini S.p.A, commonly known as Lamborghini, would incorporate Maxwell ultracapacitors into its stop-start-idle-elimination system in all of Lamborghini's Aventador cars to be built in late 2012.

85.     On October 25, 2012, Defendant Schramm, with the knowledge and explicit approval of Defendants Guyett, Jorden, and Rossi, caused Maxwell to issue a press release announcing the Company's third quarter 2012 financial results. The Company reported net income of $5.4 million, or $0.19 diluted EPS, and revenue of $43.9 million for the second quarter ended June 30, 2012.

86.    On October 30, 2012, Maxwell filed its third quarter 2012 Form 10-Q with the SEC. Defendants Schramm and Royal made the decision, which could not have been the product of valid business judgment because it was inaccurate, based on improper accounting, and the product of inadequate internal controls over financial reporting, to sign the Form 10-Q, which referred to Maxwell's Form 10-K for the year ended December 31, 2011, as well as to the Company's accounting policies. The Form 10-Q further stated in part, emphasis added:

> We are committed to maintaining disclosure controls and procedures designed to ensure that information required to be disclosed in our periodic reports filed under the Securities and [sic] Exchange Act of 1934 (the "Exchange Act") is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure.
>
> ***Under the supervision and with the participation of our management, including our Principal Executive Officer and Principal Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of September 30, 2012***, as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act. ***Based on this evaluation, our Principal Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Quarterly Report on Form 10-Q***.

87.    Based on the inaccurate financial statistics included in the statements listed above made during the Relevant Period, on February 13, 2013, the Compensation Committee of the Board of Directors of Maxwell once again approved increases in the base salaries and cash bonuses for Maxwell's named executives. Defendants Guyett, Howsmon, and Rossi (Chairman) were members of the Compensation Committee and explicitly approved these decisions. The Compensation Committee increased Defendant Schramm's base salary from $512,325 to $530,555; additionally the Committee awarded him 33,896 RSA as long-term incentive awards and a targeted bonus of $530,555. The Compensation Committee increased Defendant Royal's base salary from $322,922 to $334,413 and

awarded him 15,046 RSA as long-term incentive awards and a $167,207 targeted bonus. The Compensation Committee increased Defendant Andrews' base salary from $277,200 to $287,064 and awarded him 12,188 RSA as long-term incentive awards and a $143,532 targeted bonus. Due to the problems with the filing of the Form 10-K for the year ending December 31, 2012 and the impending announcement less than a month later of incorrect financial statements and a material weakness in internal controls over financial reporting, the Compensation determined to no payment of cash bonuses would be made to the named executive officers under the Company's 2012 incentive bonus plan.

88.     The Compensation Committee increased the base salaries based on its authority set out in the Compensation Committee Charter.

89.     The Compensation Committee approved the targeted bonuses for Defendants Schramm, Royal, and Andrews under the Company's 2013 incentive bonus plan, which has identical terms to the 2012 bonus plan.

90.     All of the awards granted on February 13, 2013 were based on the financial statements released during the Relevant Period, which Maxwell has now publicly stated are not to be relied upon. The payment of this additional, unearned, incentive based compensation to the Officer Defendants directly damaged Maxwell.

### The Truth is Revealed

91.     Then, on March 7, 2013, after the market closed, the truth was revealed when Maxwell issued a press release disclosing that the Company would be restating previously issued financial statements for 2011 and most of 2012 due to errors related to the timing of recognition of revenue from sales to certain distributors. The Company further disclosed that the financial statements for 2011 and 2012 should no longer be relied upon. The release stated in part, emphasis added:

> Maxwell Technologies, Inc. announced today that on March 1, 2013, the audit committee of its board of directors concluded that the ***previously issued financial statements contained in its annual report on Form 10-K for the year ended December 31, 2011, and all unaudited quarterly***

***reports on Form 10-Q in 2011 and 2012*** (collectively, the "Prior Periods"), as well [sic] its selected financial data for the related periods, ***should no longer be relied upon because of errors in those financial statements.*** The errors relate to the timing of recognition of revenue from sales to certain distributors.

In addition to the financial statements for the Prior Periods, related press releases furnished on current reports on Form 8-K, reports and stockholder communications describing its financial statements for the Prior Periods and the report of its independent registered public accounting firm, McGladrey LLP (formerly McGladrey & Pullen, LLP), related to the year ended December 31, 2011, should no longer be relied upon.

The conclusion that the financial statements for the Prior Periods cannot be relied upon is the result of an investigation by Maxwell's audit committee, with the assistance of independent outside counsel and forensic accountants. The investigation commenced following receipt of information concerning potential recognition of revenue prior to the satisfaction of certain of the criteria required to be met to recognize revenue.

The investigation discovered arrangements with certain distributors regarding the payment terms for sales to such distributors with respect to certain transactions. These arrangements had not been communicated to Maxwell's finance and accounting department and, therefore, had not been considered when recording revenue on shipments to these distributors. Based on the terms of the agreements with these distributors as they were known to the finance and accounting department, it had been the policy to account for revenue related to shipments to these distributors as title passed to the distributor at either shipment from Maxwell's facilities or receipt at the distributor's facility, assuming all other revenue recognition criteria had been achieved. As a result of the arrangements discovered during the investigation, Maxwell does not believe that a fixed or determinable sales price existed at the time of shipment to these distributors, nor was collection reasonably assured, at least with respect to certain transactions. Therefore, the revenue from such sales should not have been recognized at the time of shipment to these distributors.

Maxwell believes that the impact to the Prior Periods of correcting the errors in revenue recognition related to sales transactions to these distributors will be to decrease previously reported revenue and profits for 2011 and the first three quarters of 2012, and to increase revenue and profits by the same amounts in subsequent periods.

Maxwell believes that the restatement of revenue related to these distributors will decrease previously reported revenues for fiscal year 2011 by approximately $6.5 million and decrease revenues in the first three quarters of 2012 by approximately $5.5 million in the aggregate.

Maxwell also believes that the restatement of revenue related to these distributors will result in shipments to these distributors for which title has passed to the distributor, but for which the revenue recognition criteria has not been fully achieved, of approximately $12.0 million as of

September 30, 2012. Of the shipments to these distributors that had not been collected as of September 30, 2012, and therefore not recognized as revenue, Maxwell collected $4.6 million in the fourth quarter of 2012 and $3.0 million to date in the first quarter of 2013, leaving $4.4 million outstanding that will be recognized as revenue as Maxwell receives payments in the future.

***Maxwell is in the process of evaluating deficiencies in its internal controls over financial reporting and have preliminarily concluded that it has material weaknesses in its internal controls over financial reporting related to the identification and evaluation of revenue transactions which deviate from contractually established payment terms and therefore has preliminarily concluded that its internal controls over financial reporting and disclosure are not effective.*** Maxwell intends to design and implement controls to remediate these deficiencies.

As a result of the investigation, certain employees were terminated and Maxwell's Sr. Vice President of Sales and Marketing resigned.

The Company, including the audit committee, has discussed the foregoing matters with Maxwell's independent registered public accounting firm, McGladrey LLP. The audit committee has authorized and directed the officers of the Company to take the appropriate and necessary actions to restate its financial statements for the Prior Periods. Maxwell intends to file restated financial statements for the Prior Periods as soon as reasonable practicable.

92. The Company further disclosed in a Form 8-K filing on March 7, 2013 that Defendant Andrews had resigned from his position as Senior Vice President of Sales and Marketing, effective March 1, 2013, as a direct result of the ongoing investigation being performed by the Audit Committee and Maxwell's Board of Directors into the wrongdoing contained herein.

93. Thus, for the first time, the Company revealed several key facts, including: the inaccuracy of its previous two years of financial reports, the inaccuracy of its independent audits, the lack of discernible sales price for transactions that took place with several distributors and the resulting improper recognition of revenue, and that its internal controls over financial reporting were inadequate.

94. Upon disclosure of the true facts, the Company's stock price dropped $1.01 per share on March 8, 2013 to close at $8.10 per share, a one-day decline of

11% on volume of 1.7 million shares. A decline of 62% from the Relevant Period high price of $21.20 per share.

95.     The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, included:

(a)     Maxwell had overstated its revenues and earnings in 2011 and 2012 in violation of GAAP.

(b)     Maxwell had reported revenues prior to the time the sales price was fixed and/or collection was reasonably assured.

(c)     Maxwell's internal accounting controls were deficient and permitted the premature recognition of revenue, leading to materially misstated financial results.

96.     As a result of the Individual Defendants' false and misleading statements, Maxwell common stock traded at artificially inflated prices during the Relevant Period. However, after the above-alleged revelations of the true but undisclosed facts seeped into the market, the Company's common stock experienced exorbitant selling pressure sending its price down nearly 62% from its Relevant Period high.

97.     On March 19, 2013 Maxwell determined that it was unable to file with the SEC its annual report on Form 10-K for the year ended December 31, 2012 within the prescribed time period without unreasonable effort or expense.

98.     Additionally, as of April 9, 2013, based on the foregoing facts the corporate governance analysis subscription service GMI Analyst gives Maxwell's Board a "C" rating for governance.  The key factors listed for this rating are the Company's prior accounting investigations and other high impact events including recent year's FCPA settlements, the Securities Class Action, and the overall inadequacy of internal controls at the Company.

99.     While it reached a Relevant Period high stock price of $21.20 per share on November 4, 2011, Maxwell is currently trading around $5 per share.  This is despite entering into numerous high-profile lucrative contracts with distributors and manufacturers.  The stock price remains low due in large part to the lack of investor confidence in the Company due to its inadequate internal controls over financial accounting and loss of goodwill due to the issuance of false and misleading statements.  If the Individual Defendants had instituted a proper system of internal controls, issued accurate statements, and the accounting were proper throughout the Relevant Period, it is very likely that Maxwell would be doing quite well, but because of the Individual Defendants' breaches of fiduciary duties, the Company is in a much weaker position.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

100.   Plaintiff brings this action derivatively in the right and for the benefit of Maxwell to redress injuries suffered, and to be suffered, by Maxwell as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

101.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

102.   Maxwell is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff is and was a shareholder of Maxwell at the time of the transgressions complained of.   Plaintiff will adequately and fairly represent the interests of Maxwell and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

103.   The wrongful acts complained of herein subject, and will continue to subject, Maxwell to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

104.   The wrongful acts complained of herein were unlawfully concealed from Maxwell's shareholders.

105.   Throughout the Relevant Period, the Individual Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties. The course of action related misrepresenting the financial integrity of the Company, and caused the Individual Defendants to breach the following corporate principles, among others:

- Directors, officers and employees are prohibited from illegally trading the Company's securities while in possession of material, nonpublic ("inside") information about the Company;

- comply with United States generally accepted accounting principles at all times;

- maintain books and records that accurately and fairly reflect the Company's transactions; and

- maintain a system of internal controls that will provide reasonable assurances to management that material information about the Company is made known to management, particularly during the periods in which the Company's periodic reports are being prepared.

106.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Maxwell Board to institute this action since such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The wrongful acts complained of herein show a wholesale abandonment by the Individual Defendants of their fiduciary duties of due care and oversight.  Such abandonment includes, but is not limited to the following:

a)   Allowing for materially inadequate controls over the Company's policies and practices with respect to accounting for inherent corporate value, goodwill, and asset valuations;

b)   Allowing the Company's financial statements to be artificially inflated; and

c)   Allowing the Company to fail to disclose pertinent, material, and important information in a timely manner.

107.   At the time this action was commenced, the Board consisted of eight directors: non-Defendants Jean Lavigne, Burkhard Goeschler, and Jose L. Cortes and Defendants Schramm, Guyett, Rossi, Jorden, and Howsmon.

108.   A majority of the Board is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action for the following reasons:

a)   Defendants Schramm, Guyett, Rossi, Jorden, and Howsmon are substantially likely to be held liable for breaching their fiduciary duties and wasting corporate assets by issuing false and misleading statements and maintaining inadequate internal controls over financial reporting as complained of herein.

b)   Defendant Schramm has served as a director as well as Maxwell's President and CEO since July 2007. Because he is both an officer and a director he is an insider in the corporation. He is the primary individual responsible for the wrongdoing alleged in the Securities Class Action (*See Foster v. Maxwell Tech., Inc., et al*, 3:13-CV-00580-H-RBB (S.D. Cal., filed Mar. 13, 2013)). He also was inseparably tied to all of the false and misleading statements made by Maxwell. As CEO, he had a specific duty to ensure the accuracy of the financial statements and signed each of the public filings and a certification of internal controls

relating to each.  Schramm is not disinterested because it is very likely that he will be held liable in any action brought on behalf of the corporation for his alleged wrongdoing. During the relevant period, Schramm received compensation in the form of $1,578,400 in total compensation in 2011 and is slated to receive at minimum his base salary of $512,325 for 2012 plus bonuses of $400,000 incentive based annual bonus, 37,240 RSA as long-term incentive awards, and a targeted bonus of $512,325.  The actual total final 2012 numbers have not yet been disclosed because the Company has not yet filed its 2012 Annual Report on Form 10-K nor its 2013 proxy statement due to the fact that its financial statements during the Relevant Period can no longer be relied upon and need to be restated.  Defendant Schramm owns 363,164 shares of Maxwell stock, accounting for 1.25% of the total shares outstanding. Due to his extensive compensation and stock holdings, he is entrenched in the Company.

109.  Defendants Guyett, Jorden, and Rossi all served as members of the Audit Committee during the Relevant Period.  Defendant Guyett was and continues to be the Chairman of the Audit Committee.  According to the Audit Committee Charter, Defendants Guyett, Jorden, and Rossi had the specific duty to oversee all material aspects to the Company's reporting, control, and audit functions.  Because they breached that duty, there is a high likelihood that they will be held personally liable in any litigation brought on behalf of the corporation. It is for this reason among others that the members of the Audit Committee are not disinterested and cannot reasonably decide whether to bring litigation against themselves on behalf of the corporation. Defendant Howsmon was a director throughout the relevant period. He is not disinterested because he has been a director since 2008 and approved each of the acts that are the subject of this litigation.  During his time as a director of Maxwell he has

received $344,700 in total compensation and maintained extensive social relationships with the other officers and directors named as Defendants herein. He also owns 29,997 shares of Maxwell stock.   Additionally, Defendant Howsmon, along with Defendants Guyett and Rossi, was a member of the Compensation that approved the improper raises and incentive based bonuses for each of the Officer Defendants.

110.   During the Relevant Period the Individual Defendants caused or allowed the Company to fail to maintain proper internal accounting controls and to issue false and misleading statements regarding the same.   The Individual Defendants' misconduct has severely damaged the Company.   The Company has been forced to pay costly settlements relating to improper internal controls in the area of FCPA during the Relevant Period and now faces a lawsuit alleging violations of the federal securities laws.   Further, and more importantly, Maxwell's reputation and goodwill have been tainted by the misconduct described herein.

111.   As detailed above, the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees, or they completely abdicated their responsibility to oversee the Company's operations and let management run roughshod over the Company for their personal gain and causing the Company to engage in illegal and/or improper conduct that rendered the Company's public disclosures misleading, destroying in their wake, much of the Company's shareholder value.   The Defendants' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment.   As such, demand is excused as futile.

112.   In addition, Defendant Schramm will take no action against the remainder of the Maxwell Board, and they will take no action against him, because Defendant Schramm was CEO, President, and director of Maxwell.   As CEO, Defendant Schramm was compensated handsomely throughout the Relevant Period,

despite continued breaches of fiduciary duties.  Due to his compensation package, awarding Schramm with millions of dollars, he will take no action against the remaining Maxwell directors.  Therefore, demand as to Defendant Schramm is excused as futile.

113.   Defendant Schramm will also take no action against the other members of the Board of Directors because he, together with several other former and current executives of Maxwell being sued herein, was directly responsible for the illegal acts and practices complained of herein, thus any pursuant demand upon the members of the Board of the Company to take the actions requested by Plaintiff herein must necessarily be excused. Moreover, by virtue of their respective positions on the Board, all the Defendants either knew of should have known about the Company's disregard for GAAP.   Therefore, a majority of the Board are either directly responsible for the Company's practices or were derelict in carrying out the express oversight duties with which they were charged.  As such, demand is excused as futile. During the Relevant Period, the Audit Committee consisted of Defendants Guyett (Chair), Jorden, and Rossi.  The Audit Committee Charter charges its members with reviewing the adequacy and effectiveness of the Company's accounting and internal controls policies and procedures.  Thus, Defendants Guyett, Jorden, and Rossi were expressly responsible for ensuring that Maxwell did not have material weaknesses in its accounting controls.  In addition, the Audit Committee is responsible for ensuring that Maxwell complies with all laws and regulations that have a material impact on the Company's financial statements.   Defendants Guyett and Jorden both have extensive experience in positions of financial management and oversight.  Defendant Guyett is licensed as a CPA.  In fact, on its definitive proxy statements filed with the SEC in the years 2010, 2011, and 2012, Maxwell stated "Mr. Guyett and Ms. Jorden have been designated by the Board as the Audit Committee's financial experts." Despite their experience, duties, and responsibilities, the members of the Audit

Committee failed to ensure that the Board had adequate corporate governance policies in place to prevent the wrongdoing alleged herein.  As such, Defendants Guyett, Rossi, and Jorden face a substantial threat of liability and cannot fairly consider a demand to commence litigation.

114.  Furthermore, Defendants Guyett (Chair), Jorden, and Rossi, as the current members of the Audit Committee, Defendant Schramm as President, CEO, and director, and Defendant Royal as CFO of Maxwell, during the Relevant Period were responsible for ensuring that the Company's internal controls over compliance and financial reporting were adequate and that the Company's quarterly and annual financial statements were accurate.  Thus, the Audit Committee was directly responsible for approving, and the President, CEO and CFO as a signatory to, the Company's failure to comply with accounting principles and to issue materially false and misleading financial statements.  Therefore, there is significant doubt that these Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing and loyalty, as well as other violations of law.  As such, the Defendants Schramm, Guyett, Rossi, and Jorden are not disinterested or independent, and are not capable of responding adequately to a demand.  Demand on them is therefore excused as futile.

115.  In addition, by its Board Guidelines, the entire Board is "expected to promote the best interests of the Company's stockholders in terms of corporate governance, fiduciary responsibilities, risk management, compliance with applicable laws and regulations, and maintenance of accounting, financial and other internal controls."  Further, "[i]n discharging their responsibilities, directors should be able to rely on the honesty and integrity of the Company's senior management and expert legal, accounting, financial and other advisors."

116.   Similarly, the Company's Code of Business Conduct and Ethics requires all of Maxwell, including the Board, to "ensure that no false or intentionally misleading entries are made in Maxwell's accounting records. Intentional misclassification of transactions regarding accounts, departments, or accounting periods violate the law and the Code."

117.   Indeed, the adoption of the Sarbanes-Oxley Act also placed significant additional responsibilities on the Board of Directors of Maxwell, to improve corporate financial, accounting and internal controls, and to improve corporate financial responsibility and disclosure.   Thus, despite the Maxwell Board's public posture of concern over good corporate governance, controls, disclosure integrity and overall compliance with the Sarbanes-Oxley act, in fact, at all relevant times, the Individual Defendants had caused or allowed the falsification of the Company's reported financial results.   Any real compliance with Sarbanes-Oxley, would have exposed the Individual Defendants' scheme, brought it to an end and resulted in embarrassing discharges and disclosures.   Thus, the Board of Maxwell did not enforce or comply with Sarbanes-Oxley, despite its legal obligation under U.S. law to do so, and they will not now sue themselves for their failures to achieve such compliance.

118.   The Individual Defendants' conduct described herein and summarized above demonstrate a pattern of misconduct that could not have been the product of legitimate business judgment as it was based on intentional, reckless and disloyal misconduct.   Thus, none of the Individual Defendants, who constitute a majority of the current Board of the Company, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).   As a majority of the Individual Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to

pursue this action on behalf of the shareholders of the Company.   Accordingly, demand is excused as being futile.

119.   Furthermore, the Maxwell Board is still dominated and controlled by the exact same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Maxwell or its shareholders.   The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

a)   The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

b)   Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.   Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

c)   The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

d)   In order to bring this action for breach of fiduciary duty, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who have personal relationships and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.   They therefore would not be able to vigorously prosecute any such action; and

e)   The members of the Maxwell Board, including each of the Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their

control of Maxwell. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves. The Director Defendants salaries actually increased each year during the Relevant Period. Defendant Schramm received $1,578,400 in total compensation in 2011, up from $1,160,600 in 2010, and $1,068,700 in 2009. This 2011 raise was due in large part to the false financial figures that Maxwell released under his watch. The same is true for the non-executive directors. Defendant Guyett received $80,178 in cash compensation in 2011, up from $51,875 in 2010, and $49,250 in 2009. Defendant Rossi saw a similar spike for 2011, receiving $85,822 in cash compensation for that year, up from $43,750 in 2010 and $49,250 in 2009. Defendant Jorden's cash compensation for 2011 soared to $66,000, a far cry from her $34,250 in 2010 and $23,500 in 2009. Lastly, the largest percentage increase in salary went to Defendant Howsmon. He received $56,000 in cash compensation in 2011, up from $15,000 in 2010 and $18,500 in 2009.

120. Moreover, each of the Individual Defendants, as an officer or director of Maxwell, had intimate knowledge of all major operations of the Company, and yet participated in dissemination of material misstatements of the Company's financial information. Thus, the Individual Defendants all have a personal interest in concealing any blame for Maxwell's internal control problems, and shifting the blame away from themselves for consciously disregarding fiduciary duties. An

1  investigation or inquiry that spread blame higher up the corporate ladder — to the
2  Individual Defendants, as officers and/or directors — would not be in the personal
3  interest of the Individual Defendants. The result of such an inquiry would require
4  them to return valuable but unearned compensation to the Company.

5    121. In addition, all defendants face a sufficiently substantial likelihood of
6  liability, and, thus, there is a reasonable doubt as to his disinterestedness in deciding
7  whether pursuing legal action would be in the Company's best interest.

8                    **DAMAGES TO THE COMPANY**

9    122. As a direct and proximate result of the Individual Defendants'
10 misconduct, Maxwell failed to maintain proper internal accounting controls, caused
11 the Company to release false and misleading statements, and substantially damaged
12 the Company's market capitalization and goodwill.

13   123. Furthermore, Maxwell has expended and will continue to expend
14 significant sums of money. Such expenditures include, but are not limited to:

15          (a) the extensive costs, including the hiring of additional auditors and
16 the waste of resources incurred in investigating and defending Maxwell and certain
17 officers in the Securities Class Action, plus potentially hundreds of millions of dollars
18 in settlement or to satisfy an adverse judgment;

19          (b) the extensive costs incurred in investigating the claims made and
20 from the settlements reached relating to Maxwell's lack of internal controls with
21 regard to the FCPA;

22          (c) costs incurred from compensation and benefits paid to the
23 Individual Defendants, which compensation was based at least in part on Maxwell's
24 artificially-inflated stock price and inflated growth prospects; and

25          (d) costs incurred from the loss of the Company's customers'
26 confidence in Maxwell's products.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          53

124.   Maxwell has already admitted that it will have to restate its previously filed financial statements.  This restatement will subject the Company to significant costs in the form of accounting, legal, and similar professional fees, in addition to the substantial diversion of time and attention of the Company's CFO, other officers and directors and members of the Company's accounting department in preparing and reviewing the restatement.  Any such restatement could also adversely affect the Company's business, its ability to access the capital markets and the market price of Maxwell common stock.

125.   The wrongful acts described above have also led to the loss of two key Maxwell executives, the Senior Vice President of Sales and Marketing and the Chief Operating Officer.  In order to replace these officers, the Company will have to expend untold resources and pay adequate compensation to recruit talented candidates.  The search will also cause a substantial diversion of time and attention of the Company's remaining officers and directors and lengthen the period of time necessary to implement proper internal controls.

126.   On March 20, 2013, Maxwell received a notification letter from the Listing Qualifications Department of the NASDAQ Stock Market LLC ("NASDAQ") advising the Company that it is not in compliance with NASDAQ Listing Rule 5250(c)(1) for continued listing due to the Company's inability to file its annual report on Form 10-K with the SEC for the year ended December 31, 2012 on a timely basis.  Although, the letter has no immediate effect on the listing of the Company's common stock, it is the first step in the process of being delisted from the NASDAQ exchange.  If Maxwell's stock is delisted from NASDAQ it will suffer a severe drop in value because it will no longer be readily tradable.

127.   Moreover, these actions have irreparably damaged Maxwell's corporate image and goodwill.  For at least the foreseeable future, Maxwell will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who

have been implicated in illegal behavior and have misled the investing public, such that Maxwell's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## COUNT I

### DERIVATIVELY AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

128.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

129.   Defendants owed and owe Maxwell fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Maxwell the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

130.   All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

131.   Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.   Defendants caused or allowed Maxwell to lack requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions, manipulated facts, and/or fraudulent accounting practices.

133.   Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

134.   Defendants caused or allowed financial statements to be materially misstated.

135.   Defendants caused or allowed Maxwell's Relevant Period financial statements to be materially misleading and not prepared in accordance with GAAP principles.

136.   Defendants caused or allowed Maxwell to fail to disclose pertinent and material information.

137.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Maxwell has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### DERIVATIVELY AGAINST ALL DEFENDANTS
### FOR ABUSE OF CONTROL

138.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

139.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Maxwell, for which they are legally responsible. Among the abuses of control was: (i) defendants' failure to supervise, and to exert internal controls over, and conscious disregard of responsibilities involving proper accounting of the Company's financial operations and (ii) defendants' reckless and/or grossly negligent failure to properly utilize corporate wide stress tests to determine whether or not the Company's stated financials were properly accounted for in accordance with the Company's policies.

140.   As a direct and proximate result of defendants' abuse of control, Maxwell has sustained significant damages.

141.   As a result of the misconduct alleged herein, defendants are liable to the Company.

# COUNT III

## DERIVATIVELY AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

142.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

143.   By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Maxwell in a manner consistent with the operations of a publicly held corporation.

144.   The Individual Defendants caused or allowed Maxwell to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated accounting procedures.

145.   The Individual Defendants caused or allowed the Company's financial statements to be materially misstated due to the defendants' failure to properly account for the Company's revenue recognition and other financial measurements.

146.   The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company financial statements, as well as the Company's safety and compliance practices.

147.   The Individual Defendants caused or allowed financial statements to be materially misstated.

148.   The Individual Defendants, including members of the Audit Committee, did not take seriously their primary responsibility for the Company's safety, compliance, and financial reporting activities.

149.   As a direct and proximate result of The Individual Defendants' gross mismanagement and breaches of duty alleged herein, Maxwell has sustained significant damages in excess of hundreds of millions of dollars.

150.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

### COUNT IV

### DERIVATIVELY AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

151.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

152.   As alleged herein, the Individual Defendants have caused Maxwell to waste valuable corporate assets by awarding Defendants Schramm, Royal, Andrews, and Kreigler excessive and improper compensation and benefits paid based, in part, on the inaccurate financial statements complained of herein.

153.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### COUNT V

### DERIVATIVELY AGAINST DEFENDANTS SCHRAMM, ROYAL, ANDREWS, AND KREIGLER FOR UNJUST ENRICHMENT

154.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

155.   Defendants Schramm, Royal, Andrews, and Kreigler were unjustly enriched by their receipt of excessive compensation in the form of increased annual base salaries, long and short-term incentive based compensation, and cash bonuses, that were given based, in part, on the inaccurate financial statements complained of herein.  They are thus in possession of money and other property which, in equity and good conscience, should be returned to the Company.

156.   It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Defendants Schramm, Royal, Andrews, and

1  Kreigler to retain the excessive and unwarranted financial payments they have

2  received.

3       157.  To remedy the Defendants Schramm, Royal, Andrews, and Kreigler's

4  unjust enrichment, the Court should enter an order compelling them to disgorge to the

5  Company the proceeds they received from increased annual base salaries, long and

6  short-term incentive based compensation, and cash bonuses.

7  **PRAYER FOR RELIEF**

8       **WHEREFORE**, Plaintiff demands judgment as follows:

9       A.  Against all of the Individual Defendants and in favor of Maxwell for the

10  amount of damages sustained by the Company as a result of the Individual

11  Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement,

12  waste of corporate assets and negligence.

13       B.  Directing Maxwell to take all necessary actions to reform and improve

14  their corporate governance and internal procedures to comply with applicable laws

15  and to protect Maxwell and its shareholders from a repeat of the damaging events

16  described herein, including, but not limited to, putting forward for shareholder vote

17  resolutions and amendments to Maxwell's By-Laws or Articles of Incorporation and

18  taking such other action as may be necessary to place before shareholders for a vote

19  the following Corporate Governance Policies, including measures to:

20       i.  Strengthen the Board's supervision of accounting and legal

21  compliance by the company, including the development of procedures for greater

22  shareholder input into the policies and guidelines of the Audit Committee;

23       ii.  Permit the Maxwell shareholders to nominate at least two

24  candidates to the Audit Committee.

25       iii.  Remove Defendant Schramm from his role as Chairman and CEO

26  of Maxwell.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT     59

1     C.    Awarding to Plaintiff the costs and disbursements of the action,

2  including reasonable attorneys' fees, accountants' and experts' fees, costs, and

3  expenses;

4     D.    And such other relief as this Court deems just and proper.

5                   **<u>JURY DEMAND</u>**

6     Plaintiff hereby demands a trial by jury for all claims triable to a jury.

7  Dated: April 13, 2013

8                        Respectfully submitted,

9                        **FARUQI & FARUQI, LLP**

10           BY:

11                        David E. Bower, Esq. (State Bar No. 119546)

12                        **FARUQI & FARUQI, LLP**
                           10866 Wilshire Boulevard, Suite 1470

13                        Los Angeles, California  90024
                           Telephone: (424) 256-2884

14                        Facsimile: (424) 256-2885
                           E-Mail: dbower@faruqilaw.com

15                        Michael J. Hynes, Esq.
                           Ligaya Hernández, Esq.

16                        **FARUQI & FARUQI, LLP**
                           101 Greenwood Avenue, Suite 600

17                        Jenkintown, PA 19046
                           Telephone:  (215) 277-5770

18                        Facsimile:  (215) 277-5771

19

20                        -and-
                        Beth A. Keller, Esq.

21                        **FARUQI & FARUQI, LLP**

22                        369 Lexington Avenue, 10th Floor
                         New York, New York 10017

23                        Telephone:  (212) 983-9330
                        Facsimile:  (212) 983-9331

24

25                        *Attorneys for Plaintiff*

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT          60

## VERIFICATION

I, Walter Kienzle, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 2̲2̲ , 2013                                  _____
                                                                          Walter Kienzle