FILED

14 MAY 27  AM 10: 54

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MAXWELL TECHNOLOGIES, INC. DERIVATIVE LITIGATION | LEAD CASE NO. 13-CV-966-BEN (RBB) |
| | (Derivative Action) |
| This Document Relates to: | **ORDER:** |
| ALL ACTIONS | **(1) GRANTING NOMINAL DEFENDANT MAXWELL TECHNOLOGIES, INC.'S MOTION TO DISMISS** |
| | **(2) DENYING AS MOOT MOTIONS TO DISMISS FILED BY INDIVIDUAL DEFENDANTS** |
| | [Docket No. 39, 40, 43] |

Before this Court is the Motion to Dismiss filed by Nominal Defendant Maxwell Technologies, Inc. (Maxwell). (Docket No. 39). For the reasons stated below, the Motion is **GRANTED**.

## BACKGROUND

Maxwell is a Delaware corporation with a principal place of business in San Diego, CA. (Verified Consol. S'holder Derivative Compl. [Compl.] ¶¶ 29, 81). Maxwell develops, manufactures, and markets energy storage and power delivery products, as well as microelectronics. (*Id.* ¶ 81).

On March 7, 2013, Maxwell announced that it was restating its financial

statements for 2011 and the first three quarters of 2012. Maxwell's sales organization made arrangements with distributors for special payment terms. Under Maxwell's revenue recognition policy and GAAP principles, revenue is only to be recognized where certain conditions are met. As a result of the arrangements, the revenue from such sales should not have been recognized at the time of shipment. However, the arrangements were not communicated to the finance and accounting department. Maxwell recognized the revenue from these sales too early, causing the financial statements to overstate revenue. The inaccurate revenue numbers were included in a number of SEC filings.[1] These filings assert that GAAP principles are used and that the financial statements "present fairly the financial position, results of operations, and cash flows" of Maxwell. (*Id.* ¶ 59). The financial data was also discussed in conference calls with investors.

On April 26, 2012, Maxwell announced disappointing financial results for the first quarter of 2012. (*Id.* ¶ 127). A one-day drop of $6.20 per share, from $15.80 per share to $9.60 per share, followed. (*Id.* ¶ 128).

On March 7, 2013, Maxwell made the announcement that there had been errors in past financial statements and it would be required to restate results for 2011 and the first three quarters of 2012. (*Id.* ¶ 8). Maxwell's press release disclosed the fact that this was due to premature revenue recognition. (*Id.*) Maxwell stated in its press release that it had preliminarily concluded that there were "material weaknesses" in its internal controls over financial reporting related to the identification and evaluation of revenue transactions which deviate from contractually established payment terms, and

---

[1] Maxwell asks this Court to take judicial notice of documents referenced in the complaint and filed with the United States Securities and Exchange Commission. (Docket No. 39-2). Plaintiffs did not state any objection to this Court taking judicial notice of these documents. Documents incorporated by reference in the Complaint and whose authenticity no party questions, are properly considered in a motion to dismiss. *In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 953-54 (N.D. Cal. 2007) (taking judicial notice of SEC filings and other public documents in ruling on motion to dismiss on grounds of demand futility). Accordingly the Request for Judicial Notice is **GRANTED**.

13cv966

1  that therefore its internal controls over financial reporting and disclosure "are not

2  effective." (*Id.*) Maxwell also announced that certain employees had been terminated,

3  and that the Senior Vice President of Sales and Marketing had resigned. (*Id.*) The next

4  day, shares fell $1.01. (*Id.* ¶ 152)

5      On March 19, 2013, Maxwell announced that McGladrey LLP had resigned as

6  the independent accounting firm. (*Id.* ¶ 153). McGladrey stated that it could not rely

7  on management's representations, that there were material weaknesses in internal

8  controls, and that it could not rely on information obtained directly from third parties.

9  (*Id.*)   On April 30, 2013, Maxwell disclosed that the DOJ and SEC had begun

10  investigations. (*Id.* ¶ 191).

11      Maxwell published the restated financial statements on August 1, 2013. In total,

12  Maxwell admitted that it overstated $10.1 million in revenue in 2011, and $9.2 million

13  in 2012. (*Id.* ¶¶ 12, 155, 156).

14      In October 2013, Maxwell announced that Maxwell's President and CEO, David

15  Schramm, would leave his position at the end of the year. (*Id.* ¶ 227).   Maxwell

16  reached an agreement with Schramm whereby Schramm would serve as an advisor to

17  Maxwell for two years. (*Id.*)   The agreement also contained restrictive covenants,

18  provided compensation, and addressed legal claims. (*Id.*)

19      Separate shareholder derivative actions were filed in the Southern District of

20  California by Plaintiffs Walter Kienzle and Sameer Agrawal.   The actions were

21  consolidated on October 30, 2013. (Docket No. 28).   A Verified Consolidated

22  Shareholder Derivative Complaint was filed on January 30, 2014. (Docket No. 38).

23      In addition to nominal defendant Maxwell Technologies, the Amended

24  Complaint names as "Individual Defendants" members of Maxwell's board of directors

25  and certain Maxwell officers. The "Director Defendants" are José L. Cortes, Roger

26  Howsmon, Burkhard Goeschel, Jean Lavigne, Mark Rossi, Robert Guyett, Yon Yoon

27  Jorden, and David Schramm. (Compl. ¶¶ 30-38). Three of the eight directors; Guyett,

28  Jorden, and Rossi; are members of the Audit Committee. (*Id.* ¶¶ 34-36). Schramm also

1   served as President and Chief Executive Officer of Maxwell from 2007 to 2013. (*Id.*
2   ¶ 37).   The three other "Officer Defendants" are Kevin S. Royal (Chief Financial
3   Officer), George Kriegler III (Senior Vice President and Chief Operating Officer from
4   August 2009-April 2012), and Van M. Andrews (Senior Vice President, Sales and
5   Marketing until his resignation on March 1, 2013). (*Id.* ¶¶ 40-42).

6        Plaintiffs allege that the Individual Defendants breached their fiduciary duties
7   by causing Maxwell to issue false and misleading statements about Maxwell's financial
8   condition, and by falsely representing that Maxwell maintained adequate internal
9   controls despite knowing that the controls were materially deficient.   (*Id.* ¶ 2).
10  Plaintiffs allege that the Individual Defendants knew and concealed from the public the
11  fact that Maxwell had overstated revenues and earnings, that revenue had been reported
12  before the sales price was fixed and collectability was reasonably assured, and that the
13  internal accounting controls were deficient. (*Id.* ¶ 17). They claim that the breaches
14  have led to multiple lawsuits, and will cost Maxwell millions of dollars.   (*Id.* ¶ 6).
15  They state that Maxwell's market capitalization is severely diminished and its prospect
16  of raising equity in the future is "questionable." (*Id.* ¶ 18).

17       Plaintiffs also point out that the four officers received performance-based
18  compensation. (*Id.* ¶ 252). They allege that because the financial results were inflated
19  by wrongdoing, the officers received more compensation that they would have
20  otherwise. (*Id.*)

21       The Consolidated Complaint states five claims: (1) breach of fiduciary duties;
22  (2) abuse of control; (3) gross mismanagement; (4) unjust enrichment; and (5) waste.
23  Claims one, two, three, and five are brought against all Individual Defendants.  Claim
24  four, unjust enrichment, is brought only against the four officers: Schramm, Royal,
25  Kreigler, and Andrews.  Motions to dismiss were filed by Maxwell (Docket No. 39),
26  Van Andrews (Docket No. 43), and the other individual defendants. (Docket No. 40).
27  Maxwell asks this Court to dismiss this case for failure to comply with Federal Rule
28  of Civil Procedure 23.1, on the basis that Plaintiffs have not made a demand upon the

directors, or demonstrated that such a demand would be futile and should be excused.

**LEGAL STANDARD**

"The normal rule is that a company is run by its management, and the corporation itself has the right to make claims." *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1011 (9th Cir. 2010) (citation omitted). A derivative action is an "extraordinary process" in which the courts permit a shareholder to "step into the corporation's shoes and to seek in its right the restitution he could not demand in his own." *Id.* at 1012 (internal quotations and citations omitted). Accordingly, a shareholder is required to demonstrate "strict compliance" with both federal procedural requirements and the applicable substantive law before he is able "wrest control" from the board of directors. *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008).

Federal Rule of Civil Procedure 23.1 imposes special requirements when one or more shareholders of a corporation bring a derivative action to enforce a right that the corporation may properly assert, but has failed to enforce. FED. R. CIV. P. 23.1(a). The complaint is required to:

> state with particularity:
>
> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority . . .; and
>
> (B) the reasons for not obtaining the action or not making the effort.

FED. R. CIV. P. 23.1(b)(3). A shareholder who seeks to bring a derivative suit must either first demand action from the board, or "plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics, Inc. Secur. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322-24 (2007). In determining whether demand would be futile under the circumstances, courts apply the law of the state of incorporation. *Id.* at 990. As Maxwell is a Delaware corporation, this Court therefore applies Delaware law.

A stockholder may prosecute a derivative suit only in situations where the stockholder has demanded that the directors pursue the corporate claim and they have

1   wrongfully refused to do so, or where demand is excused because the directors are

2   "incapable of making an impartial decision regarding such litigation." *Rales v.*

3   *Blasband*, 634 A.2d 927, 932 (Del. 1993). Where plaintiffs seek to redress harm to the

4   corporation based on misconduct by its directors, stockholders often do not make a

5   demand. *Id.* at 933.

6          In determining whether demand is futile, a court determines whether "facts are

7   alleged with particularity which create a reasonable doubt that the directors' action was

8   entitled to the protections of the business judgment rule." *Aronson v. Lewis*, 473 A.2d

9   805, 808 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244

10  (Del. 2000). The business judgment rule presumes that in making a business decision,

11  the directors of a corporation "acted on an informed basis, in good faith and in the

12  honest belief that the action taken was in the best interests of the company." *Id.* at 812.

13         Where a shareholder plaintiff seeks to challenge a decision of the board, courts

14  apply the *Aronson* test. *Rales*, 634 A.2d at 933. Under this test, a court must determine

15  "whether, under the particularized facts alleged, a reasonable doubt is created that: (1)

16  the directors are disinterested and independent [or] (2) the challenged transaction was

17  otherwise the product of a valid exercise of business judgment." *Id.* (quoting *Aronson*,

18  473 A.2d at 814). The first prong of the test inquires into the directors, the second into

19  the substantive nature of the transaction and the board's approval thereof. *Aronson*,

20  473 A.2d at 814.

21         However, "where the board that would be considering the demand did not make

22  a business decision that is being challenged in the derivative suit," the *Aronson* test

23  does not apply. *Rales*, 634 A.2d at 933-34. This includes situations where "the subject

24  of the derivative suit is not a business decision of the board." *Id.* at 934. Then, the

25  appropriate inquiry is whether the particularized factual allegations in a complaint

26  "create a reasonable doubt that, as of the time the complaint is filed, the board of

27  directors could have properly exercised its independent and disinterested business

28  judgment in responding to a demand." *Id.*

Where, as here, the board contains an even number of members, the plaintiff must raise reasonable doubts as to half of the members. *See Beam ex rel. Martha Stewart Lving Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 n. 8 (Del. 2004) (where half of even-numbered board is not independent, there is not a majority of independent directors and demand would be futile). In the instant case, Plaintiffs must therefore make sufficient particularized factual allegations to create reasonable doubt as to at least four of the eight members of the board.

Independence means that a director's decision is based on the "corporate merits," rather than "extraneous considerations or influences." *Aronson*, 473 A.2d at 816. To raise reasonable doubt of director independence, a plaintiff must allege with particularity that the directors were "dominated or controlled" by an individual or entity interested in the transaction. *Grobow v. Perot*, 539 A.2d 180, 189 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d at 254. A plaintiff must show that the directors are "beholden" to another or so under their influence that "their discretion would be sterilized." *Rales*, 634 A.2d at 936. Stock ownership alone, at least when it is less than a majority, is not sufficient proof of dominion of control. *Aronson*, 473 A.2d at 815. Even proof of majority ownership will "not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation." *Id.* "There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person. *Id.* (citation omitted). For instance, lack of independence may be found where there is a substantial financial interest in maintaining employment positions. *Rales*, 634 A.2d at 936-37.

A director is "interested" where the director cannot be expected to exercise his or her independent business judgment without being influenced by the personal consequences of the decision. *See id.* at 936. For instance, a director is interested where he or she will receive a personal financial benefit not equally shared by the stockholders, or where the decision would have a materially detrimental impact on the

13cv966

director, but not on the corporation and stockholders. *Id.* The threat of personal liability is not enough, standing alone, to challenge independence or disinterestedness. *Id.* "Demand is not excused solely because the directors would be deciding to sue themselves." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009). However, where there is a "substantial likelihood" of liability, rather than a "mere threat," the director's ability to impartially consider a response is compromised. *Rales*, 634 A.2d at 936 (citation omitted); *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003). Demand is only excused based on possible personal director liability where the plaintiff is "able to show director conduct that is 'so egregious on its face that board approval cannot meet the test of business judgment. . .'" *In re Citigroup*, 964 A.2d at 121 (quoting *Aronson*, 473 A.2d at 815).

In order to excuse demand under the second prong of the *Aronson* test, Plaintiffs must allege particularized facts that raise doubt about whether the challenged transaction is entitled to the protection of the business judgment rule. *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005) (citation omitted)). To do so, they must plead "particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *Id.* (citation omitted).

## DISCUSSION

Plaintiffs concede that they have not made a demand upon the board of directors, but argues that demand should be excused because a demand would be futile.

In order to successfully allege demand futility, Plaintiffs must create reasonable doubt as to four of the eight directors. Maxwell states that it assumes *arguendo*, for the purposes of this motion only, that demand is excused as to Defendant Schramm because Schramm is also a corporate officer. (Mot. at 3 n. 2). Plaintiffs must therefore have alleged sufficient particularized facts to create reasonable doubt as to at least three of the remaining seven directors.

- 8 -

1    This Court will first consider the independence of the directors, as the allegations
2    appear to affect multiple claims. This Court will then consider each claim to determine
3    if Plaintiffs have raised reasonable doubt as to the disinterestedness of three outside
4    directors, or that the transaction was otherwise the product of a valid exercise of
5    business judgment. The Court considers the allegations holistically to determine if they
6    give rise to reasonable doubts excusing demand.

7    In conducting this evaluation, the Court notes that Plaintiffs often discuss the
8    substantial showing of liability inquiry alongside arguments about the second
9    *Aronson* prong. It is occasionally unclear which prong of the *Aronson* test the
10   Plaintiffs were attempting to argue. This Court took into consideration how all of
11   Plaintiffs' arguments impacted both inquiries.

12   I. Independence As to All Claims

13   Plaintiffs contend that reasonable doubt has been created as to the independence
14   of all directors. As Plaintiffs appear to question the independence of the directors as
15   to all claims, this Court will address this issue at the outset.

16   Plaintiffs raise a number of specific issues with regard to Defendant Cortes.
17   First, Plaintiffs state in the Complaint that the Board itself determined that Cortes lacks
18   independence because it determined that he was not an independent director under
19   NASDAQ listing standards. (Compl. ¶ 217). Plaintiffs have not explained the
20   NASDAQ listing standards or their relevance to the independence determination for
21   demand futility. However, courts have determined that being deemed "not
22   independent" for NASDAQ purposes does not bear upon independence for demand
23   futility purposes. *See In re Google, Inc. S'holder Deriv. Litig.*, No. C 11-4248 PJH,
24   2013 WL 5402220, at *7 (N.D. Cal. Sept. 26, 2013). The two standards are completely
25   different. *Id.*

26   Plaintiffs also alleged that Cortes could not render an independent decision
27   because he has been a director since 2002 and received compensation of $110,000 in
28   2011 for his role on the Board. (*Id.* ¶ 218). Plaintiffs assert that instituting an action

"would jeopardize the lavish compensation" he is expected to receive in future years. (*Id.*) At the outset, Plaintiffs do not explain how Cortes' long tenure undermines either his independence or the independence of others. Plaintiffs do not explain how his salary allows him domination or control of others, or how it allows an interested party to dominate or control him. Plaintiffs' arguments appears to suggest disinterestedness issues that will be addressed later in this Order.

Plaintiffs allege that the 2012 Proxy Statement asserts that Cortes owns 3.94% of the total outstanding shares of Maxwell. (*Id.* ¶ 219). Plaintiffs then assert that: "As a long-term director and large shareholder of Maxwell, Cortes dominates and controls the other Board members. Thus, demand is futile as to Cortes." (*Id.*) Although this allegation largely appears to question Cortes' disinterestedness, it also suggests that the other Board members might not be independent as a result of Cortes' tenure and stock holdings. However, stock ownership alone is not sufficient proof of domination or control. *See Kaplan v. Centex Corp.*, 284 A.2d 119, 122-23 (Del. Ch. 1971). Here, Plaintiffs allege only 3.94% share ownership, and do not make any other showing that Cortes has any special influence over the other directors. For example, there are no allegations regarding Cortes' ability to affect the employment or compensation of other directors. To the extent Plaintiffs suggest that Schramm's status as a 1.25% shareholder allows him to exercise domination or control, the argument similarly fails. (Compl. ¶ 208)

Plaintiffs also appear to argue that the course of events and the transition agreement establish that Schramm has domination and control over the Board. (*See id.* ¶ 226). First, they argue that Schramm used "his domination and control of Maxwell" to scapegoat lower level executives. (*Id.*) The point out that he is still the focus of a fraud investigation, and was named in a related securities fraud class action lawsuit. (*Id.*) These allegations do not explain how Schramm exercises domination and control of the other Board members, and are at best an alleged symptom of that influence. The accusations by Plaintiffs do not indicate an improper degree of influence. Although

13cv966

1  Schramm may be under investigation or named in a lawsuit, Plaintiffs do not explain
2  how the actions of the Board indicate that they are not independent, particularly given
3  that Schramm has not, to this Court's knowledge been indicted, convicted, or found in
4  any way to be responsible for the misconduct.

5      Plaintiffs allege that Schramm also used "his domination and control of the
6  Board" to negotiate a resignation in which he would receive hundreds of thousands of
7  dollars, rather than being fired for cause and being forced to compensate Maxwell.
8  (*Id.*) The transition agreement provided that Schramm would serve as President and
9  CEO until December 31, 2013, then serve as a senior advisor to Maxwell from January
10  1, 2014 until December 31, 2015. (*Id.* ¶ 227). The agreement allegedly allows
11  Schramm to receive a 2013 bonus. (*Id.*) The agreement provides that he will receive
12  his former base salary and a health stipend of $45,177 per month, in exchange for his
13  service as a senior advisor and other terms and conditions, including a release
14  agreement. (*Id.*) He is treated as continuing his employment for the purposes of his
15  stock options, restricted stock awards, and performance stock awards, except that he
16  forfeits back to Maxwell the restricted stock awards and performance stock awards
17  granted in February 2013. (*Id.*) Schramm also agreed to be subject to non-competition,
18  non-solicitation, and cooperation covenants while serving as a senior advisor. (*Id.*)
19  Plaintiffs place emphasis on an alleged "mutual release" of any and all claims arising
20  from Schramm's employment with Maxwell. (*Id.* ¶ 228). Plaintiffs argue that, without
21  this "self-interested payoff," Schramm would have received only $147,800 for
22  resigning. (*Id.* ¶ 229).

23      The transition agreement does not establish that any of the directors are under
24  the domination or control of Schramm. At the outset, this allegation only suggests one
25  possible symptom of domination and control, and does not itself explain how Schramm
26  achieved this. Regardless, this agreement does not create reasonable doubts about the
27  directors' independence from Schramm. Maxwell points to the many benefits that
28  Maxwell received from the agreement, including his services as an advisor, a release

of claims by Schramm, and restrictive covenants.  Maxwell also argues that Plaintiffs misrepresent the release of claims, and that the argument only involves a release of claims *by Schramm*, and does not serve as release of claims *by Maxwell against Schramm*.  Even accepting as true Plaintiffs' allegations on this point, the Court cannot determine that this agreement is tilted so favorably towards Schramm that it casts a reasonable doubt on the directors' independence and ability to make a proper business judgment about Plaintiffs' claims.

## II.  Breach of Fiduciary Duties

Plaintiffs assert that demand is futile as to its claims related to breach of fiduciary duties.  Plaintiffs' claims for breach of fiduciary duty, abuse of control, and gross mismanagement all appear to be based on related allegations and will be addressed together.  The critical question is whether Plaintiffs have sufficiently pled the futility of making a demand on the Board with regard to claims that the Board was responsible for false statements, failed to correct the statements, failed to maintain adequate internal controls, and failed to seek remedies.  To the extent Plaintiffs sought to include other actions, they are either discussed below, or were not sufficiently alleged or argued in the briefing.

First, Plaintiffs challenge the interestedness of the directors.  Specifically, they claim that the directors face a substantial likelihood of liability that renders them unable to impartially consider a demand.  Second, Plaintiffs contend that the *Aronson* test should apply, and that they have created reasonable doubt that the challenged decisions were the product of a valid business judgment.  Maxwell disputes both points.

### A. Exculpation Provision

In determining the likelihood of liability, courts take into consideration exculpatory provisions that limit the personal liability of a director for certain claims. *Guttman*, 823 A.2d at 501.  Delaware law authorizes Delaware corporations to eliminate or limit the personal liability of a director to the corporation or its

stockholders for monetary damages for breach of fiduciary duty. 8 DEL. CODE. § 102(b)(7). Such a provision limits liability to actions that are made in bad faith or constitute intentional misconduct. *In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 927-28 (N.D. Cal. 2010). Such a provision is contained in Maxwell's Articles of Incorporation. (Def. Ex. F at 82). Where the directors have been exempted from liability, the risk of liability does not disable them from considering a demand "unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption." *In re Baxter Intern., Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995); *see also Guttman* 823 A.2d at 501 (where a charter exculpates directors from breaches of the duty of care, a serious threat of liability is only found where the plaintiff pleads a non-exculpated claim against the directors).

Plaintiffs dispute whether it is appropriate to consider the impact of a provision exculpating the directors from liability due to a breach of the duty of due care. Plaintiffs cite to case law in which courts considering motions to dismiss for failure to state a claim treated the provision as an affirmative defense. *See In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. 2005); *In re Brown Sch.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007). However, the considerations informing an evaluation of demand futility are not necessarily the same as the appropriate considerations in evaluating whether a plaintiff has stated a claim. As such, Plaintiffs' citations are distinguishable from the Delaware case law which explicitly allows the consideration of such a provision in evaluating demand futility. Based on the judicially-noticeable evidence of the provision, this Court will therefore take the provision into consideration. *See Brown v. Moll*, No. C 09-05881 SI, 2010 WL 2898324, at *1 n. 1, *4 (N.D. Cal. July 21, 2010) (taking judicial notice of certificate of incorporation in order granting motion to dismiss derivative action).

///

///

## B.  Failures of Oversight and Monitoring

Plaintiffs assert that the Director Defendants are subject to a substantial risk of liability because they consciously disregarded the duty to prevent corporate wrongdoing, including the publication of misleading statements. (Opp'n at 19 (citation omitted)).  They assert that they have offered well-pleaded allegations of "conscious, bad-faith misconduct." (*Id.* at 20).

Maxwell contends that Plaintiffs have pleaded only "*Caremark* claims" for a failure of oversight, and that these claims are unlikely to succeed. (Mot. at 13).  In *In re Caremark Intern., Inc. Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996), a Delaware Chancery Court considered claims that "the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." The *Caremark* court discussed two situations: one where liability follows from an ill-advised or negligent board decision, and another where the loss comes from "unconsidered inaction." *Id.* at 967-68. In adopting standards articulated in *Caremark*, the Delaware Supreme Court stated:

> We hold that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (internal citations omitted).

Maxwell points out that Plaintiffs repeatedly refer to the existence of a set of internal controls. (Mot. at 14).  Maxwell points to its Audit Committee, Governance and Nominating Committee, Audit Committee Charter, and a Code of Business Conduct and Ethics. (*Id.*)  Plaintiffs do not appear to dispute that Maxwell had a

1  system of internal controls, although they clearly question its adequacy.

2      Plaintiffs' ability to bring a *Caremark* claim therefore hinges on making
3  sufficient allegations that the directors consciously failed to monitor or oversee the
4  system of internal controls.  Plaintiffs assert that the directors face a substantial
5  likelihood of liability due to their "conscious disregard." (Opp'n at 19-22).  They
6  therefore seek to distinguish their claims from the "unconsidered failure" to act in
7  *Caremark*. (*Id.* at 20).

8      In seeking to characterize the alleged occurrences as conscious disregard or
9  inaction, Plaintiffs point to the Seventh Circuit's analysis in *In re Abbott Laboratories*
10  *Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003).  In *Abbott*
11  *Laboratories*, shareholders sought to sue the board of directors for harm resulting from
12  a consent decree with the Food and Drug Administration which forced the company to,
13  among other things, pay a $100 million fine and withdraw certain items from the
14  domestic market. *Id.* at 798.  The Seventh Circuit found that plaintiffs did not create
15  a reasonable doubt as to the disinterestedness or independence of a majority of the
16  directors. *Id.* at 807.  However, they did find that Plaintiffs had created a reasonable
17  doubt that the directors exercised proper business judgment. *Id.* at 808-09.  The board
18  in *Abbott Laboratories* had received three FDA warning letters concerning violations
19  of federal regulations, and company representatives had met with the FDA concerning
20  the violations at least ten times. *Id.* at 808.  The company's problems with the FDA
21  were raised in the media, and Abbott had issued a press release indicating that the
22  company knew of the problems and were aware of the FDA's threat. *Id.*  The Seventh
23  Circuit ultimately concluded that the board knew of the problems and decided no action
24  was required. *Id.* at 806.

25      Here, however, Plaintiffs fail to demonstrate that there is a substantial likelihood
26  of liability on a "conscious disregard" theory.  Review of the briefing and factual
27  allegations reveals that Plaintiffs do make conclusory allegations that Board members
28  "recklessly disregarded" problems. (Compl. ¶ 173).  However, Plaintiffs do not

1    provide the factual allegations necessary to support this conclusion. The allegations
2    do not allow this Court to infer that the Board was "conscious" in its alleged failures
3    to act. This is principally due to the fact that Plaintiffs do not provide factual
4    allegations from which this Court could conclude that the directors knew or should
5    have been alerted to the fact that there was a problem.

6         Plaintiffs' reliance on *Abbott Laboratories* does not support its claim.
7    Principally, there is no indication that the Maxwell Board received the kind of obvious
8    warning signs that characterized *Abbott Laboratories*. Plaintiffs point to a January
9    2011 deferred prosecution agreement as evidence that the directors knew that
10   Maxwell's internal controls are inadequate. (Opp'n at 21). The agreement involved
11   a different scheme and a different problem with internal controls. Plaintiffs provide no
12   explanation for their conclusory assertion that books-and-records and internal control
13   problems related to illegal kickbacks to Chinese officials demonstrate "precisely the
14   same lack of adequate internal controls" as failing to take special sales arrangements
15   into account when determining revenue. (Compl. ¶¶ 82-83; Opp'n at 21). Plaintiffs
16   do not show how the involvement with the past incident should have put the Director
17   Defendants on heightened alert to the problems at issue. In *In re Citigroup Inc.*
18   *Shareholder Derivative Litigation*, the Delaware Chancery Court rejected an effort to
19   impose a higher standard on defendants who were on the company's board during a
20   prior scandal, where plaintiffs failed to show how company's involvement in earlier
21   scandal had any relevance. 964 A.2d at 129. The Chancery Court contrasted the case
22   to a Sixth Circuit case, *McCall v. Scott*, in which there was a prior investigation and
23   settlement for "the *same type* of questionable billing practices." *Id.* (citing 239 F.2d
24   808, 821 (6th Cir. 2001) (emphasis in *In re Citigroup*)). Examination of the allegations
25   does not indicate that the kickback scheme in China should have put the Maxwell
26   directors on higher alert to unrelated problems with reporting sales arrangements and
27   recording revenue. There are no factual allegations that the Board received any kind
28   of warning related to revenue recognition before the commencement of the internal

investigation. Certainly, they did not receive the kind of specific warnings seen in *Abbott Laboratories. See also Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963) ("absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.").

Plaintiffs also appear to suggest in the Complaint that the directors should have known of the misstatements and inadequacies, or must have consciously disregarded their duties. The underlying argument appears to be that if they did not know, then they must have been failing their duties. Such conclusory allegations must fail. *See In re Citigroup*, 964 A.2d at 126-27 (conclusory allegations that because defendants failed to prevent losses, they must have consciously ignored warning signs or failed to monitor risk in accordance with their fiduciary duties are insufficient). Instead, Plaintiffs are required to make particularized factual allegations demonstrating bad faith by the Director Defendants. *See id.* at 127. Plaintiffs have not, for instance, explained how the Director Defendants knew of the internal control inadequacies at issue and consciously ignored them. *See id.* at 128. They have not alleged that the directors prepared the statements, or explained how the Director Defendants knew there were errors in the financial statements they were given. Indeed, "directors are entitled to rely on the honesty and integrity of their subordinates until something occurs to put them on suspicion that something is wrong." *Graham*, 188 A.2d at 130.

The parties disagree about whether the second prong of the *Aronson* test should be applied. If the two-prong test applies, Plaintiffs may prevail by creating reasonable doubt as to either prong. *See Aronson*, 473 A. 2d at 814[2]; *In re Abbott Labs.*, 325 F.3d at 807. Plaintiffs contend that they have pleaded "conscious bad-faith misconduct," rather than a failure to monitor. (Opp'n at 20). Specifically they stated that they have alleged that the directors consciously disregarded compliance problems, and that these

---

[2]Although it appears that Maxwell's original motion suggested that Plaintiffs needed to prevail on both prongs in challenging a board decision, (Mot. at 9, 17 n.17), the test was properly stated in the reply brief. (Reply at 2 n.2).

1   allegations are supported by particularized facts demonstrating their knowledge of, and

2   continuous failure to correct, those problems. (*Id.*)  They point out that the directors

3   knew of a past internal control failure, and argue that they alleged that the directors

4   caused Maxwell to disseminate false and misleading financial information. (*Id.* at 20-

5   21).  Plaintiffs argue that this means that the second prong may be applied to their

6   actions, as it was in *Abbott Laboratories*.  However, the Seventh Circuit in *Abbott*

7   *Laboratories* applied the *Aronson* test, rather than the *Rales* test, because the court

8   found that the allegations were sufficient for the court to assume that the board knew

9   of the problems and decided no action was required.  325 F.3d at 806.  The well-

10  pleaded factual allegations in the Complaint at hand do not support a claim that the

11  Board made a conscious decision not to act.  Although Plaintiffs are not required to

12  prove their case at this juncture, they offer little more than conclusory allegations.

13  Plaintiffs do not offer this Court any justification for applying the second prong of the

14  test to the breach of fiduciary duty allegations related to the Board's issuance of

15  incorrect financial statements, failures of internal controls, or failures to seek remedies

16  against individuals.

17          Although the directors apparently did not act to prevent, stop, or correct the

18  misstatements until the investigation was announced, the Complaint lacks factual

19  allegations from which this Court can infer that any individual Board member did so

20  consciously, rather than in complete ignorance.  Therefore, to the extent that Plaintiffs

21  sought to hold the Director Defendants liable based on claims for failures to act,

22  oversee, and correct, they have not pleaded particularized facts creating a reasonable

23  doubt as to the disinterestedness of the directors, as they have not made a sufficient

24  showing that there is a substantial likelihood of liability.

25          C.  Making and Approving False Statements

26          Plaintiffs allege that all Director Defendants face a substantial likelihood of

27  liability for "making and approving the false and misleading statements." (Compl.

28  ¶ 220).  Plaintiffs point to the fact that the directors signed the February 16, 2012 Form

1   10-K, which contained information that was subject to the restatement. (*Id.*) Plaintiffs
2   state that the Defendants "knew that these financial statements were not a fair
3   representation of the Company's actual revenue." (Opp'n at 19 (citing Compl. ¶¶ 159,
4   220)).  Plaintiffs also claim that false and misleading statements were made about the
5   adequacy of Maxwell's internal controls.  Although not always clear, Plaintiffs appear
6   to argue that 1) there is a substantial likelihood of liability based upon bad faith
7   misconduct in approving the statements, and 2) approval was an affirmative board
8   decision, subject to the second prong of the *Aronson* test.

9          Execution of financial reports, without more, is insufficient to create an inference
10   that the directors had actual or constructive notice of illegality. *Wood v. Baum*, 953
11   A.2d 136, 142 (Del. 2008).  Board approval of an improper transaction is insufficient
12   to allow a court to infer that each member of the board knew the transaction was
13   improper, or that the board consciously and in bad faith failed to discharge fiduciary
14   or contractual responsibilities with respect to those transaction.  *Id.*  Courts have
15   repeatedly held that a plaintiff must allege more than that the directors should have
16   known or must have known about matters relating to the corporation's "core business."
17   *In re Accuray*, 757 F. Supp. 2d at 928 (citation omitted).  Allegations that financial
18   statements contained false statements and material omissions, and that the director
19   defendants reviewed the statements pursuant to their responsibilities are insufficient
20   to allow a court to conclude that there is a substantial likelihood of liability.  *In re*
21   *Citigroup*, 964 A.2d at 134.  Plaintiffs must allege specific factual allegations to allow
22   a court to analyze the state of mind of individual director defendants, and cannot rely
23   on broad group allegations. *Id.*

24          Plaintiffs' claims regarding the making of these false statements are closely
25   related to claims based upon failures of oversight and inaction.  As discussed above
26   with regard to director inaction, Plaintiffs have failed to allege sufficient facts from
27   which this Court could infer that the defendants acted in bad faith.  Although they make
28   conclusory assertions that the directors knew that the statements were false, the

Complaint lacks "particularized facts" creating a "reasonable doubt" that the directors are disinterested because of a substantial likelihood of personal liability for the misstatements. General suggestions that the directors must have known fail for the reasons stated above. There are no specific allegations demonstrating how the directors knew that the financial statements were incorrect, or that internal controls were not as adequate as represented.

The Court particularly notes that Plaintiffs have provided no basis from which this Court could conclude that outside directors could have known that the sales team made secret arrangements that were not properly reported, and that the financial statements were inaccurate. There are no allegations that the Board received detailed information about sales or collections that might have raised suspicions. Particularly given that directors are entitled to rely on the honesty and integrity of their employees, the allegations here are insufficient to suggest that the directors knew the financial statements or internal control certifications were erroneous.

Plaintiffs cite to *In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. 117, 129 (D. N.J. 1999) for the notion that demand is futile where the plaintiff pleaded, among other things, that each of the director defendants signed, approved, and published the false statements. (Opp'n at 19). Review of *Cendant* indicates that the Court relied upon many additional factors in concluding that a reasonable doubt had been created as to the disinterestedness of the directors, including factual allegations related to special compensation packages and insider trading. *Id.*

Maxwell contends that the second prong should not apply to these false statement claims. The *Aronson* test has been found not to apply to claims that board members signed misleading statements on behalf of the corporation and failed to prevent the corporation from misrepresenting its financial condition, where the plaintiff did not point to a specific board action that approved or ratified the alleged wrongdoings. *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Lundgren*, 579 F. Supp. 2d

520, 529 (S.D.N.Y. 2008) (applying *Rales* test to claims related to allegedly false and misleading public statements).  However, even if the second prong applied, the failure to sufficiently allege knowledge undermines Plaintiffs' claims.  While it is true that *knowing* approval of false financial statements could have little justification, Plaintiffs provide no argument to support a claim that approval of the statements would not be entitled to business judgment protections if the directors were unaware of the misstatements.  For instance, they have not sufficiently alleged that any member of the Board failed to meet his or her obligation to be informed.

### D. Failure to Seek Remedy

Plaintiffs also suggest that the Director Defendants may be liable as a result of their failure to seek remedies for the harm done to Maxwell.  (*See* Compl. ¶ 233).  They assert that the failure to file lawsuits against "any directors or officers who were responsible for the losses" is a breach of fiduciary duty.  (*Id.*)  Plaintiffs have not demonstrated a substantial likelihood of liability on this point.  First, Plaintiffs have not pled facts from which this Court might infer that the Board knows that a particular director or officer is legally "responsible" for the losses.  Additionally, they have not provided authority or argument to support a claim that their fiduciary duties would require filing a lawsuit.  Given the costs and risks of litigation, Plaintiffs have not demonstrated that the Board faces a substantial likelihood of liability for a failure to undertake that particular action in this circumstance.  They do not point to a specific Board decision not to hold responsible parties accountable, and the current allegations would not create reasonable doubt that such a decision was a valid business judgment.

### E. Audit Committee

Plaintiffs contend that the three directors who serve on the audit committee face substantial likelihood of liability, owing to their positions.  Plaintiffs allege that the Audit Committee Defendants are "responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and Maxwell's internal controls over financial reporting."  (*Id.* ¶ 209).  Each is alleged to have breached his

1  duty of candor and good faith by approving the false statements. (*Id.*) Plaintiffs assert
2  that before approving financial reports, these defendants were required to review with
3  management and the independent auditors 1) "the results of the independent auditors'
4  reviews of quarterly unaudited financial statements and annual audited financial
5  statements," and 2) "the annual audited financial statements to be included in the
6  Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q,
7  including, but not limited to, management's discussion and analysis of financial
8  condition and results of operations, and related disclosure topics, prior to the filing of
9  such reports." (*Id.* ¶ 210). Plaintiffs allege that these obligations were breached
10  because the Audit Committee Defendants either failed to conduct the requisite reviews,
11  or conducted only a cursory, perfunctory review of the financial statements. (*Id.*
12  ¶ 211). Plaintiffs argue that they therefore "acted in bad faith and abdicated their
13  fiduciary duties" when approving false and misleading statements. (*Id.*) Plaintiffs also
14  allege that the Audit Committee Defendants were responsible for ensuring adequate
15  internal controls, legal and regulatory compliance, and implementation of accounting
16  and reporting policies and procedures. (*Id.* ¶ 212). Plaintiffs assert that these
17  responsibilities were abdicated because these defendants "failed to ensure" adequate
18  internal controls. (*Id.* ¶ 213). Plaintiffs allege that the Audit Committee Defendants
19  were "on notice" that Maxwell's internal controls were "lacking" based on the January
20  2011 deferred prosecution agreement. (*Id.*) The Audit Committee Defendants, "as
21  members of Maxwell's Board, each knew, or consciously disregarded, that the public
22  statements were materially false and misleading." (*Id.* ¶ 215). They also allegedly
23  "failed to correct" the financial statements and signed the report in the March 2012
24  Proxy Statement. (*Id.* ¶ 216).

25      Membership on an audit committee is not a sufficient basis to infer scienter. *See*
26  *Wood*, 953 A.2d at 142. The allegations are insufficient to demonstrate that the Audit
27  Committee Defendants knew about the problems or should have known if they were
28  fulfilling their duties. No allegations indicate that the true nature of Maxwell's

13cv966

1   financial condition was ever brought to the Audit Committee Defendants' attention.
2   Even allegations that the defendants should have examined the financial statements
3   does not establish that they should have known there were problems in the documents.
4   There are no factual allegations to show that these defendants should have suspected
5   misconduct in the reporting of sales or preparation of statements.  There are no
6   allegations that they had the necessary information to realize that there were
7   misstatements. Thus, Plaintiffs' allegations regarding service on the audit committee
8   do not indicate a substantial likelihood of liability with regard to breaches of fiduciary
9   duty with regard to false statements or inadequate internal controls.

10  III. Compensation Claims

11          Plaintiffs raise a number of claims in the area of executive compensation, and
12  appear to suggest that the Individual Defendants may be liable for breach of duty or
13  waste claims.  Plaintiffs also point out that Guyett and Rossi were members of the
14  Compensation Committee, and allege that they face a substantial likelihood of liability
15  for 1) approving lavish compensation packages that were unjust and unearned in light
16  of the artificially inflated results, and 2) negotiating and approving an employment
17  agreement with Schramm that included a definition of "for cause" which Plaintiffs
18  assert is "one-sided and beneficial" to Schramm and prejudicial to Maxwell.  (Opp'n
19  at 24; Compl. ¶¶ 223, 225).  Plaintiffs allege that the individual defendants wasted
20  corporate resources by awarding such compensation and benefits based on inaccurate
21  financial statements.  (Compl. ¶ 259).

22          Directors have broad discretion to make decisions about executive compensation.
23  *In re Citigroup*, 964 A.2d at 138.  It is the "essence of business judgment" for a board
24  to determine if a particular individual "warrants large amounts of money, whether in
25  the form of current salary or severance provisions." *Brehm*, 746 A.2d at 263 (citations
26  and internal quotations omitted).  However, there is an "outer limit" to the discretion,
27  at which point "a decision of the directors on executive compensation is so
28  disproportionately large as to be unconscionable and constitute waste." *Id.* at 262 n. 56

1   (citations omitted).  The standard for evaluating a waste claim is whether there is "an
2   exchange of corporate assets for consideration so disproportionately small as to lie
3   beyond the range at which any reasonable person might be willing to trade." *Id.* at 263.

4        A.  Bonuses and Compensation

5        Plaintiffs have failed to plead demand futility as to their compensation claims.
6   Plaintiffs allege that these bonuses are unjust and unearned because they were awarded
7   based on artificially-inflated revenue numbers. (Compl. ¶¶ 186, 254). Plaintiffs assert
8   that it is unlikely any bonuses would have been paid if the financial statements had
9   been correct. (*Id.* ¶ 187).

10        To the extent they bring claims based upon the awarding of compensation and
11   bonuses to the officers, they have not generated reasonable doubt as to either prong of
12   the *Aronson* test.  There is no substantial likelihood of liability on these facts.  It is true
13   that if, as alleged, the Board *knew* that the revenue numbers were inflated and that
14   certain officers received compensation based on incorrect numbers, that such a decision
15   would be difficult to justify.  However, Plaintiffs, as discussed above, have provided
16   little more than conclusory allegations of knowledge at the time the bonuses were
17   awarded.  They do not raise any reasonable doubts that, at the time the decision was
18   made, any directors acted in bad faith by awarding bonuses they knew or suspected
19   were unearned.  Plaintiffs also do not raise reasonable doubts that this decision is
20   entitled to the protections of the business judgment rule. There are no allegations about
21   the amount or structure of the bonus that suggest that the compensation was not a good-
22   faith award within the Board's broad discretion to decide how best to motivate and
23   compensate officers in this particular company and situation.  There are no allegations
24   that the Board failed to meet the minimum standards for informing itself before acting.
25   Certainly, there are no factual allegations suggesting that compensation was so one-
26   sided as to constitute waste.

27   ///
28   ///

13cv966

### B. "For Cause" Provision

Plaintiffs also do not generate reasonable doubt with regard to the inclusion of an allegedly narrow "for cause" provision in Schramm's employment contract. Even if this Court were to accept that the provision, in isolation, is "totally one-sided and beneficial to Schramm," Plaintiffs have not sufficiently alleged that the entire agreement was so one-sided. (Opp'n at 24). This Court cannot find that reasonable doubt has been created simply because a company agreed to an employment contract containing an appealing provision for an officer. Companies may have many good-faith reasons to include a narrow definition, including receiving other advantages in the contract, luring talent, and discouraging undue caution. This Court does not determine that any of these situations apply here. However, Plaintiffs do not provide any argument that this provision alone is so outrageous as to raise reasonable doubts about the application of the business judgment rule. Plaintiffs do not discuss the contract as a whole, and do not provide factual allegations to support a claim that the employment agreement was outside the range of acceptable and rational agreements. Plaintiffs also do not sufficiently allege that this decision was made in bad faith, or that the Board was not properly informed.

### C. Transition Agreement

Plaintiffs also do not generate reasonable doubt under either *Aronson* prong with regard to the transition agreement reached with Schramm. The allegations are insufficient to raise a substantial likelihood of liability for waste or breach of fiduciary duty. Plaintiffs interpret the transition agreement as heavily favoring Schramm at Maxwell's expense. They contend that Schramm will receive at least $1,084,248 in cash payments, plus the ability to exercise stock options, restricted stock awards and performance stock awards. (Opp'n at 11; Compl. ¶ 229). Plaintiffs allege that he otherwise would have received only $ 147,800 for resigning his position. (Opp'n at 11). However, it is clear from Plaintiffs' own allegations that the Agreement conferred benefits upon Maxwell. Maxwell received the benefit of Schramm's continued

services, and received a release of some legal claims.  Schramm also agreed to be subject to restrictive covenants, and forfeit certain stock awards.  Such provisions clearly provide  benefits to Maxwell.

Whether such benefits to Maxwell justify the salary and other benefits given to Schramm is a business decision for the Board.  Plaintiffs do not raise any reasonable doubt that this decision fell outside the outer limits of the Board's broad discretion to determine how to compensate Schramm.  Even accepting Plaintiffs' description of the transition agreement,[3] the agreement is clearly not so disproportionate and one-sided as to constitute waste.  Although Plaintiffs point to a provision they claim releases Schramm from liability, an interpretation that Maxwell strongly disputes, the Court notes that Plaintiffs have not made allegations that suggest that such a provision would necessarily be in bad faith or lead to liability for waste.  Plaintiffs have not shown that the Board knew or should have known that such a provision would prevent the company from making a worthwhile recovery.  Indeed, demand futility is founded on the idea that the board is usually the proper body to determine when it is in the company's best interests to commence litigation.  The allegations do not raise doubts that the Board acted in bad faith, or that it was not adequately informed about the contents or the situation before approving the agreement.

## IV.  Compensation for Board Service

Plaintiffs argue that Cortes could not render a proper decision because instituting an action would jeopardize the "lavish compensation" he would expect for future service.  (Compl. ¶ 218).  It is not entirely clear how Plaintiffs are contending his compensation is jeopardized.  To the extent Plaintiffs are suggesting that Cortes might be removed from the Board as a result of this lawsuit, this Court looks to its analysis on the likelihood of liability.  This Court will not speculate for Plaintiffs on the ways compensation may be jeopardized.

---

[3]Plaintiffs do not clearly dispute the authenticity of the document provided by Defendants, and do not address Defendants' contention that Plaintiffs have misstated its contents.

## V.  Directors & Officers Insurance

Plaintiffs also point to the typical conditions of "directors and officers insurance" (D&O insurance).  They point out that any D&O insurance is likely to contain an "insured versus insured exclusion." (Opp'n at 26; Compl. ¶ 232).  If so, it likely would protect the directors against derivative claims, but not against claims brought directly by Maxwell.  (Opp'n at 26).  Plaintiffs contend that, when combined with other allegations, this can be a basis for finding demand futile. (*Id.* (citing *Grill v. Hoblitzell*, 771 F. Supp. 709, 713 (D. Md. 1991) ("if what plaintiff alleges is true, the directors may have deprived themselves of the ability to exercise independent judgment as to the advisability of instituting an action . . .")))  However, such an insurance provision alone is not a sufficient basis to infer demand futility under Delaware law.  *In re Am. Int'l Grp., Inc. Deriv. Litig.*, 700 F. Supp. 2d 419, 433 (S.D.N.Y. 2010) (citations omitted); *Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005) (citing *Caruana v. Saligman*, No. 11135, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 2009) (finding that such claims do not provide particularized facts creating a reasonable doubt as to either disinterestedness or independence)).

## CONCLUSION

Taken together, Plaintiffs' allegations are insufficient to allege demand futility.  Accordingly, for the reasons stated above, the Motion to Dismiss filed by Maxwell is **GRANTED**.  The action is **DISMISSED WITHOUT PREJUDICE**.  If Plaintiffs seek to file an amended complaint, they must do so within **thirty (30)** days of the date this Order is filed.

The Motions to Dismiss filed by Van Andrews (Docket No. 43), and by the other Individual Defendants (Docket No. 40), are therefore **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated: May 27, 2014

HON. ROGER T. BENITEZ
United States District Judge

13cv966